ORDERED that defendant Whitehall's motion for summary judgment be and is hereby GRANTED.

Jerry Lee HOGUE, Petitioner,

v.

Wayne SCOTT, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. 4:92–CV–359–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Nov. 16, 1994.

As Corrected Nov. 23, 1994.

Order Denying Motion to Alter or Amend Judgment Jan. 18, 1995.

Robert Charles Owen, Texas Resource Center, Austin, TX, Phyllis Louise Crocker, Cleveland State University, Cleveland–Marshall College of Law, Cleveland, OH, for petitioner.

Reneau J. Longoria, Office of the Atty. Gen., Austin, TX, for respondent.

*CONTENTS of MEMORANDUM OPINION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS*

Page

I. INTRODUCTION — 1496
II. AN EVIDENTIARY HEARING IS NOT REQUIRED — 1496
III. COURSE OF PROCEEDINGS AND DISPOSITIONS IN STATE COURT AND IN PRIOR FEDERAL COURT ACTIONS INSTITUTED BY HOGUE — 1496
IV. THE EVIDENCE ESTABLISHING HOGUE'S GUILT — 1500
 A. Witness Crawford — 1500
 B. Witness Renick — 1503
 C. Witness Nix (Jonathan) — 1505
 D. Witness Mr. Gamble — 1505
 E. Witness Mrs. Gamble — 1506

F. Witness Brammall 1507
G. Witness Shetler 1507
H. Witness Cowsert 1507
I. Witness Kraus 1507
J. Witness Liggett 1507
K. Witness Gibson 1508
L. Witness Beaty 1508
M. Witness Megason 1508
N. Witness Johnson 1508
O. Witness Watkins 1508
P. Hogue's Defensive Theory 1508

V. EVIDENCE RECEIVED AT THE PUNISHMENT PHASE OF HOGUE'S TRIAL 1509
 A. Witness White 1509
 B. Witness Diezei 1509
 C. Witness Samson 1509
 D. Witness Hightower 1509
 E. Witness Grigson 1510
 F. Witness Becky Hogue 1510
 G. Witness Dickerson 1510
 H. Witness Ebel 1511

VI. THE GROUNDS OF THE PETITION 1511
 A. Preliminary Statement 1511
 B. Respondent has Waived Exhaustion 1512
 C. The "Abuse-of-the-Writ" Determination Bars Hogue from Asserting Grounds 14–33 1512
 1. Other Potentially Pertinent Procedural Events 1513
 2. Analysis Related to the "Abuse-of-the-Writ" Issue 1514
 D. Hogue's Grounds Related to his 1974 Colorado Conviction are Without Merit 1515
 (Pertaining to the 16th and 17th grounds of the petition, which read:
 16. THE STATE KNOWINGLY PRESENTED A FALSE PICTURE OF MR. HOGUE'S GUILTY PLEA TO RAPE IN COLORADO.
 17. THE ADMISSION OF MR. HOGUE'S VOID PRIOR CONVICTION AT THE SENTENCING PHASE VIOLATED RIGHTS GUARANTEED BY THE U.S. CONSTITUTION.)
 1. The roles Hogue's Colorado conviction played in his state court trial proceedings 1516
 2. The role Hogue's Colorado conviction played in his state court direct appeal 1519
 3. The role Hogue's Colorado conviction has played in his post-conviction, petitions and applications 1520
 4. The mentions to the jury at Hogue's trial of the Colorado conviction were not a significant factor in Hogue's conviction or sentence—if there was error, it was harmless 1521
 5. The grounds based on mentions at Hogue's trial of the Colorado conviction are barred by the state court's abuse-of-the writ determination 1522
 6. Hogue's failure to object to evidence of the Colorado conviction for the reasons he now asserts creates another procedural bar 1522
 7. The record does not support the assertion that the state knowingly presented a false picture of Hogue's Colorado conviction 1523
 E. The State Presented Sufficient Evidence to Sustain a Verdict of Capital Murder 1523
 (Pertaining to the 7th ground of the petition, which reads:
 7. THE STATE FAILED TO PRESENT EVIDENCE SUFFICIENT TO SUSTAIN A VERDICT OF CAPITAL MURDER.)
 F. Hogue's Grounds Related to Evidentiary Matters are Unmeritorious 1523

(Pertaining to the 8th, 9th, 11th, and 31st grounds of the petition, which read:

8. THE TRIAL COURT DENIED MR. HOGUE HIS RIGHT TO CONFRONTATION WHEN IT PERMITTED A POLICE OFFICER TO TESTIFY BY RECITING A LENGTHY, UNRECORDED STATEMENT MADE BY STEVE RENICK AT THE SCENE OF THE OFFENSE.

9. GRISLY COLOR PHOTOGRAPHS WERE ADMITTED INTO EVIDENCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL SOLELY TO INFLAME THE MINDS OF THE JURORS.

11. THE ADMISSION OF EVIDENCE OF UNADJUDICATED EXTRANEOUS OFFENSES AT THE PENALTY PHASE OF MR. HOGUE'S TRIAL DEPRIVED HIM OF PROTECTIONS GUARANTEED BY THE CONSTITUTION.

31. THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENSE COUNSEL A BRIEF CONTINUANCE IN ORDER TO MEET THE STATE'S EVIDENCE OF UNADJUDICATED EXTRANEOUS OFFENSES.)

G. Hogue's Ground 29 Relative to Pretrial Motions is Without Merit ... 1525
(Pertaining to the 29th ground of the petition, which reads:
29. PRETRIAL MOTIONS HAVE NOT BEEN INCLUDED IN THE RECORD DESPITE TIMELY ORAL AND WRITTEN DESIGNATION.)

H. There was No Constitutional Error in the Denial of Hogue's Motion for a Change of Venue ... 1525
(Pertaining to the 30th ground of the petition, which reads:
30. THE TRIAL COURT ERRED IN DENYING MR. HOGUE'S MOTION FOR A CHANGE OF VENUE.)

I. Hogue's Grounds Related to a Mental Health Expert are Without Merit ... 1526
(Pertaining to the 24th and 25th grounds of the petition, which read:
24. THE TRIAL COURT ERRED IN DENYING MR. HOGUE THE SERVICES OF A MENTAL HEALTH EXPERT TO ASSIST IN PREPARING AND PRESENTING HIS DEFENSE.

25. THE TRIAL COURT ERRED IN GRANTING MORE MONEY TO THE PROSECUTION TO USE IN EMPLOYING A PSYCHIATRIC EXPERT THAN IT GRANTED TO THE DEFENSE FOR THE SAME PURPOSE.)

J. Hogue Does Not Demonstrate any Brady v. Maryland Violations ... 1526
(Pertaining to the 15th ground of the petition, which reads:
15. DESPITE SPECIFIC REQUESTS, THE STATE FAILED TO PRODUCE EXCULPATORY EVIDENCE RELATED BOTH TO GUILT/INNOCENCE AND PUNISHMENT.)

K. None of Hogue's Grounds Related to Jury Selection is Meritorious ... 1528
(Pertaining to the 5th, 12th, 20th, 21st, 22nd, and 23rd grounds of the petition, which read:
5. THE TRIAL COURT GAVE "UNOFFICIAL STRIKES" TO THE STATE DURING VOIR DIRE.

12. THE TRIAL COURT WRONGLY EXCUSED VENIREPERSON MARY PORTER FOR CAUSE.

20. THE TRIAL COURT ERRED IN REFUSING TO PERMIT DEFENSE COUNSEL TO QUESTION VENIREPERSON JOHN WESLEY STRICKLAND CONCERNING HIS ABILITY TO CONSIDER THE MINIMUM PUNISHMENT FOR NON-CAPITAL MURDER.

21. THE TRIAL COURT ERRED IN REFUSING TO EXCUSE VENIREPERSON JOHN WESLEY STRICKLAND FOR CAUSE.

22. BECAUSE JUROR PAMELA SUE HOLLEY WAS CONVICTED OF FELONY BURGLARY PRIOR TO JURY SERVICE AND WAS THEREFORE ABSOLUTELY DISQUALIFIED FROM SERVING ON THE JURY, MR. HOGUE'S JUDGMENT IS VOID AND HIS CONVICTION SHOULD BE REVERSED.

23. THE TRIAL COURT ERRED IN LIMITING DEFENSE COUNSEL'S VOIR DIRE.)

L. Nothing Prevented Hogue's Counsel from Developing and Presenting Mitigation Evidence .......... 1528
(Pertaining to the 4th and 32nd grounds of the petition, which read:
4. THE STATE PREVENTED COUNSEL FROM INVESTIGATING, DEVELOPING, AND PRESENTING RELEVANT MITIGATING EVIDENCE IN SUPPORT OF A LIFE SENTENCE FOR MR. HOGUE.

32. THE TEXAS CAPITAL SENTENCING STATUTE IMPROPERLY PRECLUDED THE JURY FROM CONSIDERING EVIDENCE IN MITIGATION OF MR. HOGUE'S SENTENCE.)

M. There was No Constitutional Error in the Court's Charges to the Jury .......... 1530
(Pertaining to the 10th, 27th and 33rd grounds of the petition, which read:
10. THE JURY CHARGE AT THE GUILT PHASE RELIEVED THE PROSECUTION OF ITS OBLIGATION TO PROVE EVERY ELEMENT OF THE CRIME BEYOND A REASONABLE DOUBT.

27. THE LACK OF DEFINITIONS FOR THE KEY TERMS IN THE SPECIAL ISSUES RESULTS IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY.

33. THE TRIAL COURT ERRED IN FAILING TO DEFINE "REASONABLE DOUBT" IN ITS INSTRUCTIONS TO THE JURY AT BOTH PHASES OF TRIAL.)

N. The Conduct of the Prosecutors Did Not Violate Hogue's Constitutional Rights .......... 1532
(Pertaining to the 13th, 18th, 19th, 26th and 35th grounds of the petition, which read:
13. THE PROSECUTORS' CLOSING ARGUMENT AT THE GUILT PHASE URGED THE JURY TO CONVICT MR. HOGUE BASED ON FEARS OF WHAT HE MIGHT DO IN THE FUTURE.

18. BY INJECTING HIS PERSONAL OPINIONS DURING CLOSING ARGUMENT, THE PROSECUTOR IRREPARABLY TAINTED THE JURY'S DELIBERATIONS ON MR. HOGUE'S GUILT.

19. THE PROSECUTOR'S ARGUMENT CONCERNING THE CHARACTER OF THE DECEASED WAS IMPERMISSIBLY INFLAMMATORY AND PREJUDICIAL.

26. THE STATE PRESENTED PERJURED TESTIMONY FROM "DR. DEATH," JAMES P. GRIGSON.

35. THE PROSECUTORS' MISCONDUCT THROUGHOUT MR. HOGUE'S TRIAL RENDERED HIS CONVICTION AND SENTENCE FUNDAMENTALLY UNFAIR.)

O. There Was No Constitutional Error Related to Juror Smith's Conduct 1534
 (Pertaining to the 1st, 2nd, 14th, and 34th grounds of the petition,
 which read:
 1. THE TRIAL COURT VIOLATED MR. HOGUE'S
 RIGHTS BY CONDUCTING AN EX PARTE EXAMI-
 NATION OF JUROR SMITH, BY DENYING DE-
 FENSE COUNSEL THE OPPORTUNITY TO REEX-
 AMINE JUROR SMITH AND BY REFUSING TO
 PERMIT COUNSEL TO EXERCISE A PEREMPTO-
 RY CHALLENGE AGAINST JUROR SMITH.
 2. COUNSEL FAILED TO PROVIDE EFFECTIVE AS-
 SISTANCE BY NOT RAISING A KNOWN CLAIM
 OF JUROR MISCONDUCT IN A MOTION FOR
 NEW TRIAL.
 14. ATTORNEY BURNS DENIED MR. HOGUE EFFEC-
 TIVE ASSISTANCE OF COUNSEL BY FAILING TO
 FILE A MOTION FOR NEW TRIAL ONCE HE
 LEARNED THAT, PRIOR TO TRIAL, ONE OF THE
 JURORS WAS BIASED AGAINST HIS CLIENT.
 34. BECAUSE JUROR SMITH WAS BIASED AND PREJ-
 UDICED AGAINST MR. HOGUE PRIOR TO HEAR-
 ING THE EVIDENCE IN THE CASE, MR. HOGUE
 WAS DENIED A TRIAL BY A FAIR AND IMPAR-
 TIAL JURY.)
P. The General Ineffective-Assistance-of-Counsel Ground has No Merit 1539
 (Pertaining to the 3rd ground of the petition, which reads:
 3. TRIAL COUNSEL FAILED TO PROVIDE MR. HO-
 GUE EFFECTIVE ASSISTANCE THROUGHOUT
 THE COURSE OF HIS TRIAL.)
 1. Hogue's complaints relative to voir dire examination 1540
 2. Hogue's complaint that trial counsel did not further investigate
 Hogue's Colorado conviction 1540
 3. The complaints that trial counsel failed to object often enough 1540
 4. Hogue's complaints relative to cross-examination of witnesses Craw-
 ford and Renick 1541
 5. Hogue's complaint that trial counsel did not make proper use of
 potential evidence pertaining to his conduct while in the reforma-
 tory and in jail 1541
 6. Hogue's complaint that trial counsel failed to rebut Hightower's
 testimony 1541
 7. The complaint that trial counsel should have developed additional
 mitigating evidence 1542
 8. Hogue's contentions that the trial counsel misperformed in failing to
 seek post-trial relief relative to juror Smith and juror Holley 1542
Q. Hogue's Conviction and Sentence Were Not Imposed Arbitrarily or
 Capriciously 1543
 (Pertaining to the 6th ground of the petition, which reads:
 6. MR. HOGUE'S CONVICTION AND DEATH SEN-
 TENCE WERE IMPOSED ARBITRARILY AND CA-
 PRICIOUSLY.)
R. There Was No Violation of the Ex Post Facto Clause 1544
 (Pertaining to the 28th ground of the petition, which reads:
 28. MR. HOGUE'S CONVICTION AND DEATH SEN-
 TENCE VIOLATE THE EX POST FACTO CLAUSE
 OF THE UNITED STATES CONSTITUTION.)
VII. THE MOTION FOR SUMMARY JUDGMENT 1544
VIII. HOGUE'S REQUEST FOR DISCOVERY AND HIS RELATED MOTION
 PURSUANT TO RULE 56(f) ARE DENIED 1544
IX. ORDER 1544

*MEMORANDUM OPINION
AND ORDER*

McBRYDE, District Judge.

Before the court for determination is a petition for writ of habeas corpus ("petition") filed by an inmate, Jerry Lee Hogue, ("Hogue") of the Texas Department of Criminal Justice, Institutional Division, who is under sentence of death. The court has determined that the petition should be denied for the reasons set forth in this memorandum opinion and order.

## I.

### *INTRODUCTION*

This action is the ninth habeas corpus proceeding Hogue has instituted since his conviction by a jury in March 1980 for a murder he committed in January 1979. It is the fourth post-conviction action Hogue has filed in this court and the third application for writ of habeas corpus proceeding he has instituted in this court.

After this action was instituted by the filing of Hogue's petition in May 1992, it was referred to Magistrate Judge Alex H. McGlinchey for findings and recommendation.[1] On March 14, 1994, Magistrate Judge McGlinchey filed his findings and recommendation and made orders (1) returning the case to the docket of the district court and (2) providing that each party had until April 13, 1994, within which to serve and file with the court written objections to the magistrate judge's proposed findings, conclusions, and recommendation. The magistrate judge recommended that Hogue's petition for writ of habeas corpus be denied. On March 13, 1994, Hogue filed his objections to the findings and recommendation of the magistrate judge. For all practical purposes, Hogue objected to each and every finding as well as to the ultimate recommendation. Therefore, the court is according Hogue full *de novo* review.

## II.

### *AN EVIDENTIARY HEARING
IS NOT REQUIRED*

■ Hogue has the burden to demonstrate to the court that he is entitled to a further evidentiary hearing on one or more of his grounds for relief. *See Jernigan v. Collins,* 980 F.2d 292, 296 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993). The court is not persuaded that any of the additional evidence Hogue indicates he might offer in support of any of his grounds for relief would assist the court in making a proper disposition of Hogue's petition. Hogue had the benefit of evidentiary hearings in the state court, and he submitted declarations and affidavits in the state court,[2] as he has in this action, in support of his grounds for relief. The court has given appropriate consideration to the records of all state court hearings and other proceedings and to all declarations and affidavits filed by the parties. Where, as here, "the record is complete and the evidence in the record is sufficient to provide full review of the petitioner's claim," no evidentiary hearing is required. *Wilcher v. Hargett,* 978 F.2d 872, 877 (5th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 96, 126 L.Ed.2d 63 (1993). Therefore, the requests of Hogue for a further evidentiary hearing are denied.

## III.

### *COURSE OF PROCEEDINGS AND DISPOSITIONS IN STATE COURT AND IN PRIOR FEDERAL COURT ACTIONS INSTITUTED BY HOGUE*

By indictment filed in March 1979, Hogue was charged by a grand jury of Tarrant County, Texas, with the following offense:

JERRY LEE HOGUE hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 13th day of JANUARY 1979 did THEN AND THERE INTENTIONALLY AND

---

1. In October 1992 the district judge withdrew the reference to the magistrate judge but again referred the matter to the magistrate judge by order signed in February 1993.

2. *See, e.g.,* declaration and affidavits at pages 54–69 of 5th State Habeas Tr.

KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JAYNE LYNN MARKHAM, BY SETTING FIRE TO THE HOUSE OCCUPIED BY THE SAID JAYNE LYNN MARKHAM, AND AS A RESULT OF THE SAID FIRE, THE DEATH OF THE SAID JAYNE LYNN MARKHAM WAS CAUSED BY ASPHYXIATION DUE TO SMOKE AND CARBON MONOXIDE AND CAUSED BY CONFLAGRATION TO THE BODY OF THE SAID JAYNE LYNN MARK-HAM, AND THE DEATH OF THE SAID JAYNE LYNN MARKHAM WAS IN-TENTIONALLY COMMITTED IN THE COURSE OF COMMITTING AND AT-TEMPTING TO COMMIT THE OF-FENSE OF ARSON.[3]

Tr.[4] at 2. The charged offense is a capital offense under Texas law. Tex.Penal Code Ann. § 19.03(a)(2) and (b) (Vernon 1994).

In late 1979 Hogue's case was tried to a jury in Criminal District Court No. 3, Tar-rant County, Texas, but the jury was unable to reach a verdict, and a mistrial was de-clared. His case was again tried to a jury in March 1980 in the same court. On March 29, 1980, the jury returned a verdict at the guilt/innocence phase of the trial, finding Ho-gue guilty of capital murder. Tr. at 70. The jury then heard evidence pertinent to punish-ment; and, on March 31, 1980, the jury returned a verdict at the punishment phase of the trial, finding that (1) the conduct of Hogue that caused the death of Markham was committed deliberately and with the rea-sonable expectation that her death, or the death of another, would result and (2) there was a probability that Hogue would commit criminal acts of violence that would constitute a continuing threat to society. Tr. at 74–75. Those findings mandated a sentence of death under Texas law as it existed at the time. Tex.Code Crim.Proc.Ann. art. 37.071 (as en-acted effective June 14, 1973) (Vernon 1981). By judgment signed March 31, 1980, the state trial court adjudged Hogue guilty of capital murder and ordered that he be pun-ished by having the death penalty assessed against him. Tr. 79. By opinion of March 19, 1986, the Court of Criminal Appeals af-firmed the state trial court's judgment. *Ho-gue v. State*, 711 S.W.2d 9 (Tex.Crim.App.) (*en banc*), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986). Associate Justice White of the United States Supreme Court signed an order July 8, 1986, that stayed execution of Hogue's sentence pend-ing the filing and disposition of a petition for writ of *certiorari*, which was filed in August 1986 and denied October 20, 1986, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

On January 15, 1987, Hogue, acting through attorney Richard Alley ("Alley"), filed in state court the first application for writ of habeas corpus he filed after the affir-mance of the state trial court's judgment.[5] 1st State Habeas Tr.[6] at 6. He asserted sixteen constitutional grounds for granting the application, most of which were restate-ments of points that had been raised on his direct appeal. *Id.* at 11–16. By amended

**3.** The State moved on March 10, 1990, to strike the word "knowingly" from the indictment as surplusage. Tr. at 30. The motion was granted. S.F. Vol. 1 at 6.

**4.** The "Tr." reference is to the transcript in No. 16241, styled "Jerry Lee Hogue, Appellant v. The State of Texas, Appellee," which shows to have been received by the Court of Criminal Appeals of Texas on September 29, 1981.

**5.** Under Texas practice, an application for writ of habeas corpus filed after conviction in a felony case must be made returnable to the Court of Criminal Appeals of Texas, the clerk of which transfers or assigns it to the court in which the conviction being challenged was obtained. Tex. Code Crim.Proc.Ann. art. 11.07, § 2(a) & (b) (Vernon Supp.1994). The convicting court de-termines whether a hearing should be held, causes a hearing to be conducted if necessary, resolves disputed matters, and makes findings of fact or approves findings made by a person des-ignated by the convicting court to make them, following which the record is transmitted to the Court of Criminal Appeals of Texas for ruling by that court on the request for writ of *habeas corpus. Id.* at art. 11.07 §§ 2(c), (d) & (3) (Ver-non 1977 & Supp.1994).

**6.** The "1st State Habeas Tr." reference is to the transcript in No. C–3–1222–16241–A, styled "Ex Parte Jerry Lee Hogue," which shows to have been received by the Court of Criminal Appeals of Texas on March 9, 1987.

application filed February 18, 1987, Hogue raised a seventeenth constitutional ground for granting the writ. *Id.* at 95–96. The state trial judge signed an order on February 24, 1987, adopting findings proposed by the State, which were all adverse to Hogue, and transmitted the findings to the Court of Criminal Appeals of Texas. *Id.* at 109. On March 18, 1987, the Court of Criminal Appeals of Texas entered a *per curiam* order in its case No. 16,907–01, denying all relief requested by Hogue's application for writ of habeas corpus and Hogue's motion for stay of execution, which, at that time, was scheduled to be carried out March 24, 1987.

Hogue's second application for writ of habeas corpus was filed by Hogue, acting through Alley, in state court on March 20, 1987. 2nd State Habeas Tr.[7] at 2. It asserted seven constitutional grounds for grant of a writ, *id.* at 6–9, and incorporated by reference the application for writ of habeas corpus he had filed on January 15, 1987, *id.* at 3. By memorandum order signed March 20, 1987, the state trial court recommended denial of the application and denied a request for evidentiary hearing, finding as a matter of fact, and concluding as a matter of law, "that there are no controverting, previously unresolved facts material to the legality of [Hogue's] confinement presented in said application requiring hearing." *Id.* at 12. The Court of Criminal Appeals of Texas denied the application, and Hogue's motion for stay of execution, by *per curiam* opinion of March 23, 1987 in its case No. 16,907–02.

Hogue's third application for writ of habeas corpus was filed by Hogue, acting through Alley, in this court, and docketed as Civil Action No. 4–87–193–K, on March 23, 1987. The application presented twelve constitutional grounds. On March 23, 1987, this court, acting through the Honorable David O. Belew, Jr., signed an order granting Hogue's application for stay of execution. On May 7, 1987, Hogue, acting *pro se,* filed a motion to

dismiss Alley as his counsel, alleging that Alley acted beyond his authority in filing the petition for writ of habeas corpus. On May 27, 1987, Hogue, acting *pro se,* moved for leave to amend and supplement his petition for writ of habeas corpus, urging forty-nine additional grounds. By order signed July 9, 1987, this court, acting through Judge Belew, dismissed the petition for writ of habeas corpus without prejudice "as an action filed without permission or authorization of Petitioner"; and, the court vacated its March 23, 1987, order staying execution.

Hogue, acting *pro se,* filed his fourth application for writ of habeas corpus (his third in state court) on August 11, 1987. 3rd State Habeas Tr.[8] at 2. It asserts as constitutional bases for grant of a writ that Hogue was denied effective assistance of counsel during an evidentiary hearing, on appeal, and in connection with preparation of a writ of habeas corpus. *Id.* at 5–6. Another application for writ of habeas corpus was filed in state court on August 19, 1987, by attorney Danny Burns ("Burns") on behalf of Hogue. *Id.* at 17. Its sole point of error related to the action of the trial court in allowing the word "knowingly" to be removed from the indictment. *Id.* at 17–18. The August 11 and August 19, 1987, applications were treated as having been consolidated. *Id.* at 22. By order signed September 14, 1987, the state trial court recommended denial of the application as consolidated. *Id.* at 87. The Court of Criminal Appeals of Texas denied, by *per curiam* order in case No. 16,907–03 dated September 25, 1987, the consolidated applications for writ of habeas corpus and Hogue's application for stay of execution, which was then scheduled for September 29, 1987, *id.* at 15.

On September 25, 1987, Hogue, acting through attorneys Edgar Mason ("Mason") and Melvyn Bruder ("Bruder"), filed in this court an emergency application, which was docketed as Civil Action No. 4–87–669–K, for

---

7. The reference "2nd State Habeas Tr." is to the transcript in No. C–3–1248–16241–B, styled "Ex Parte Jerry Lee Hogue."

8. The reference "3rd State Habeas Tr." is to the transcript in No. C–3–1291–16241–C, styled "Ex Parte Jerry Lee Hogue," which is shown to have been received by the Court of Criminal Appeals of Texas on September 21, 1987.

stay of execution to permit the filing of a petition for writ of habeas corpus. By order filed September 25, 1987, this court, acting through Judge Belew, granted the application for stay of execution, pending further order of the court. By order signed October 16, 1987, the court, acting through Judge Belew, noted that, at Hogue's request, Burns and Alley were withdrawn as counsel for Hogue and that Mason and Bruder were appointed to represent Hogue. The order directed that Hogue file an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 or file a post-conviction application pursuant to Tex.Code Crim.Proc.Ann. art. 11.07 on or before January 8, 1988; that in his application Hogue present each and every claim known to him or his counsel on pain of waiver; and, that, if Hogue were to fail to file an application by January 8, 1988, the stay of execution granted on September 24, 1987, would vacate automatically. On January 8, 1988, Hogue filed in No. 4–87–669–K an application for extension of stay of execution and of time for filing of a writ of habeas corpus; and, by order signed January 8, 1988, this court, acting through Judge Belew, extended the January 8, 1988, deadline fixed by the October 16, 1987, order to January 22, 1988. Based on information the court had received that Hogue was pursuing a state court application for writ of habeas corpus, Judge Belew signed an order on March 29, 1988, dismissing No. 4–87–669–K without prejudice to refiling, and vacated the stay of execution.

Hogue's fifth application for writ of habeas corpus, his fourth in state court, was filed by Mason and Bruder on January 22, 1988. 4th State Habeas Tr. at 2.[9] It urged nine grounds for relief. *Id.* at 3–5. By order signed November 2, 1988, the state trial court ordered that all relief requested by the application be denied. *Id.* at 8. The Court of Criminal Appeals of Texas, by *per curiam* order of January 6, 1989, in its case No. 16,907–04 denied all relief sought by Hogue in his application.

On April 13, 1989, Hogue filed his third post-affirmance action in this court, this time a petition for writ of habeas corpus filed for Hogue by Mason and Bruder. It was docketed as Civil Action No. 4–89–300–K. Hogue urged five grounds for relief, all pertaining to juror Donnie Ray Smith. On April 18, 1989, this court, acting through Judge Belew, signed an order staying Hogue's execution, which was scheduled for April 20, 1989. On March 16, 1990, Hogue, acting through Mason, filed a motion to stay, or dismiss, the proceeding on the ground that Hogue wished to return to the state court and raise through the state court process issues that were suggested by the holding of the United States Supreme Court in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In July 1990 Mason and Bruder filed motions asking for permission to withdraw from representation of Hogue, giving as the ground of the motions that Hogue had complained that the attorneys had rendered ineffective assistance of counsel to Hogue, with the consequence that they had become a part of the litigation process in Hogue's post-conviction appeals and were therefore hopelessly compromised. That same month Hogue, acting *pro se,* filed his "Supplemental Motion to Stay and/or Dismiss the Proceedings Without Prejudice," in which he asserted that certain constitutional claims had not been investigated due to his counsel's *pro bono* status. His supplemental motion listed nine constitutional claims he alleged had not been investigated by his counsel. By a memorandum Hogue, acting *pro se,* filed in late July 1990, he opposed the motions of Mason and Bruder to withdraw. By order signed August 22, 1990, this court, acting through Judge Belew, appointed Harry Hickman to serve as an investigator in the case and appointed Mason and Bruder to represent Hogue under the Criminal Justice Act rather than to continue to provide *pro bono* services. The order directed Hogue, through his attorneys, to file on or before October 19, 1990, a supplemental pleading asserting each issue

9. The reference "4th State Habeas Tr." is to the transcript in No. C–3–1330–16241–D, styled "Ex Parte Jerry Lee Hogue," which shows to have

been received by the Court of Criminal Appeals of Texas on November 8, 1988.

Hogue sought to raise. On November 16, 1990, Hogue, acting *pro se*, filed a "Motion to Dismiss Counsel and to Stay and/or Dismiss the Proceedings Without Prejudice" by which Hogue complained of the sufficiency of Mason and Bruder as attorneys. By order signed March 7, 1991, this court, acting through Judge Belew, dismissed the action without prejudice, noting the request made by Hogue in the motion he filed November 16, 1990, that the court dismiss the cause without prejudice so that Hogue might have his claims fully reviewed in the state courts. By order signed April 10, 1991, the court, acting through Judge Belew, permitted Bruder and Mason to withdraw as counsel for Hogue.

On March 22, 1991, Hogue, acting *pro se*, filed his seventh application for writ of habeas corpus, his fifth in the state court. 5th State Habeas Tr.[10] at 2. He raised five grounds in that application. *Id.* at 11, 15, 20, 33, 37. On August 5, 1991, the state trial court signed an order adopting findings and conclusions proposed by the state in reference to Hogue's *pro se* application, and directed that the findings be filed and transmitted along with a transcript to the Court of Criminal Appeals of Texas. *Id.* at 158. By *per curiam* order dated September 18, 1991, in case No. 16,907–05, the Court of Criminal Appeals of Texas ruled that the grounds of Hogue's application were without merit and that Hogue had waived and abandoned his grounds by his abuse of the writ of habeas corpus.

## IV.

### THE EVIDENCE ESTABLISHING HOGUE'S GUILT

The evidence overwhelmingly establishes Hogue's guilt of the capital offense of which he was convicted. There were discrepancies in the observations and recollections of the witnesses called by the prosecution; however, the court does not consider that they raised a genuine doubt as to the overall credibility of the case against Hogue. Any reasonable mind would conclude, after having considered all the evidence, that Hogue committed the crime of conviction. An overview of his criminal conduct is that during January 12, 1979, he terrorized Mary Beth Crutcher Crawford ("Crawford"), Jayne Lynn Markham ("Markham"), Steve Wayne Renick ("Renick"), and Jonathan David Nix ("Jonathan") at their place of residence at 2412 Southcrest, Arlington, Texas, and early the morning of January 13 he poured gasoline through the house and set it afire after he had inflicted a serious stab wound to Crawford's abdomen and put her in a bedroom at the house and had bound the hands and feet of Renick and Markham and left them thus bound in another bedroom, and while Jonathan, Markham's child, was asleep in the third bedroom. Markham, while still bound, was killed by the fire. Crawford and Renick, who were seriously injured, managed to escape from the burning house. Renick rescued Jonathan through a window of the room where the child was asleep.

Set forth below is a summary of the evidence from which the jury found that Hogue committed the capital offense of which he was accused:

### A. *Witness Crawford:*

Crawford and Markham became friends in Wichita Falls, Texas, in the summer of 1978; and, Crawford became acquainted with Renick in Wichita Falls, Texas, through introduction to him by her sister, about one year before she met Markham. In late 1978 Crawford and Markham, accompanied by Markham's son, Jonathan, came to Fort Worth, Texas, with the intent to find jobs in the Fort Worth area and share a place of residence temporarily. They rented the house at 2412 Southcrest; and, they invited Renick to share the house with them in exchange for his assistance in payment of rent.

---

**10.** The "5th State Habeas Tr." reference is to the transcript in C–3–1647–16241–E, styled "Ex Parte Jerry Lee Hogue," which shows to have been received by the Court of Criminal Appeals of Texas on August 9, 1991.

At approximately 5:00 p.m., Wednesday, January 10, 1979, when Crawford returned to the house, after having been away for the day, she was introduced by Markham to a man who she had never seen before. Markham told her the man's name was "Jerry" and that he was a former tenant in the house who had returned to pick up an item he left hanging on the wall. At trial, Crawford identified Hogue as the man Markham introduced to her as "Jerry." Hogue was still at the house later that evening when Crawford and Renick went to play pool.

The next evening, Thursday, January 11, Hogue was again at the house. The realtor who had arranged for the rental of the house to Crawford and Markham came by that evening to discuss the lease. When the realtor drove up, Hogue saw him through the window, and went into another room so the realtor would not know of his presence. Throughout the time the realtor was there, Hogue remained out of sight. Hogue was still at the residence when Crawford went to bed Thursday night.

The morning of Friday, January 12, Crawford heard Hogue tell Renick that it was time for Renick to go to work; and, she heard Renick leave through the garage door. Shortly thereafter she went from her bedroom to the master bedroom, where Markham and Jonathan stayed. She saw Markham and Jonathan in the room and Hogue standing at the doorway. At the request of Markham, Crawford took Jonathan to school that morning. When she returned, she saw that Markham was upset. As Crawford was cooking breakfast after her return, Hogue told Crawford and Markham that he was a policeman and that they were under arrest for possession of marijuana. Crawford asked for identification. Hogue responded that he did not have an I.D. because he was an undercover agent. He explained that he was in the house because Renick was supposed to be a heroin dealer and supposedly had dealt heroin to a 14–year–old girl who had died; and, he said he was there to get Renick. Also, he told them that Renick had caused his marriage to break up, that he had been after Renick for a long time, and that Renick

had cost him a lot of time and money and his marriage. He told them that he would not bring charges against them, and that they could go free, after he arrested Renick; and, he said that nothing would happen to them so long as they cooperated and that, until Renick returned home, they were not to leave his sight or to speak to each other.

Hogue directed Crawford and Markham to move from place to place in the house during the day, and blindfolded and handcuffed them from time to time. At one point Crawford heard a noise coming from another room, and when she went to Renick's bedroom she saw Hogue on his knees in front of Renick's footlocker and saw his hand coming out of the footlocker with a gun, which she had not seen before. Shortly thereafter, he pointed the gun at Crawford and Markham in a threatening manner. At that time he explained to them that he had a pair of handcuffs and that one of them had to be handcuffed so that when the other police officers arrived he would be in compliance with regulations relative to handcuffing. He told them not to try to get away because he knew how to use the gun and would kill them. Hogue handcuffed Markham's hands in front of her and left her in a bedroom. After that, he directed Crawford to go into a closet, saying that if there was any gunfire he did not want either of them to be hurt.

Shortly after Crawford went into the closet, Hogue opened the closet door. When he did, he had the gun in his hand and was naked from his waist down. He stepped into the closet, put the gun under Crawford's chin, and told her to take her clothes off. She declined to do so, telling him she had a venereal disease. He left the closet and shut the door. A short while later he again opened the closet door and told her to follow him. They went to the dining room, where she saw Markham lying face down on the floor, blindfolded, completely nude, and with her hands cuffed behind her. Hogue told Crawford to undress except her underwear and to lie down by Markham. She complied. Shortly thereafter, he told Crawford to get on her knees, and he forced her at gunpoint to perform oral sodomy on him. When that

was done, he told her again to lie down by Markham. Then, he told her to help move Markham into a bedroom. Hogue followed behind them with the gun, and he put Crawford back in the closet. From there she heard Markham saying "no" and "please no." When he let Crawford out of the closet, he told her that he had not raped Markham. Markham was on her side on the bed, under the covers. Hogue directed Crawford to lie down on the bed, and he blindfolded her. He told them not to talk. After awhile, Hogue removed the blindfolds and handcuffs, and allowed Markham and Crawford to sit up, dress, and walk around. However, he did not allow either of them out of his sight for more than a short period of time. Once when Hogue was out of their presence, Crawford asked Markham if he had raped her, and she said that he had. Apparently because Hogue heard them talking, he came to where they were and took Markham into another room and handcuffed her to a bed.

Because Hogue told Crawford and Markham that when Renick returned he would free them if they did not cause trouble, they tried to cooperate with him. During the day Crawford saw Hogue put Markham's blue suitcase on the dresser in Markham's bedroom and put blue jeans in it. She does not know what happened to the suitcase after that. Jonathan came home at around 3:00 p.m. with a school friend. The friend left when Jonathan was told that he could not go out to play. Hogue stayed with Markham, Jonathan, and Crawford in Markham's bedroom. Hogue told Crawford and Markham that someone was coming to help him.

Between 5:00 p.m. and 6:00 p.m. they heard Renick drive up in his pickup. Hogue became very nervous. After he told the others to be quiet and not to move, he went to the front door. Crawford heard the door open and close and heard Renick's voice say, "okay, yeah, okay, all right." S.F. Vol. 12,[11] at 2448. Renick and Hogue came to the room where the others were located. Hogue followed behind Renick with the gun at his back. Renick's hands were cuffed. Hogue took Renick's wallet. He told Renick that Rennick was in a lot of trouble; and, he tried to tell Renick "his rights," but he did not seem to know them. *Id.* at 2450.

Hogue took Renick to another bedroom, and then came back and told Crawford that he wanted her to go to the bedroom where Renick was located to help Renick smoke a cigarette. She did so. Renick's hands were above his head, handcuffed to the headboard of a bed. While she was telling Renick what had happened during the day, Hogue came to the door with the gun. He told her to go with him to the living room, where he instructed her to look through the window. He pointed to a truck on the street and told her that those were the people who were going to help him and that they would be there soon. She recognized the truck as one belonging to a neighbor, but she did not say anything because she did not want to upset Hogue. Hogue directed her to sit on the couch by him, and questioned her about the conversation she had been having with Renick. Then, Hogue left and came back with something in his hand. He stuck something against her stomach and told her that he wanted her to go back to Renick's room and get all the information she could get. When she agreed to do as he asked, but said that she did not know what information he wanted, something hit her real hard in the stomach. She believes it was a knife. She started kicking and tried to scream, and Hogue put his hand over her mouth, jerked her off the couch, and pulled her into the hallway, where he pushed her against the wall and put a large butcher knife under her neck and said "you know, I'm going to kill you." *Id.* at 2458. She saw blood on her side, and started becoming shaky and sick. Hogue took her into the bathroom near the end of the hall, where she vomited. Markham came to her and assisted her into the living room and onto the couch. While they were there, Hogue told them that he was a hit man, something he had not said before, and that there was a contract out on each of them.

11. The "S.F." reference followed by a "Vol." number refers to a volume of the seventeen-volume record of in-court proceedings during Hogue's March 1980 trial.

Crawford continued to vomit, and Hogue took her back to the bathroom, and then assisted her to the back bedroom on the north side of the house, shoved her onto the bed, and then left. She was in pain, and was having convulsions on her left side, could not control her arm or leg, and was screaming and crying. Hogue came back several times and told her to quit screaming. Once he came in with speaker wire in his hand, and told her that if she would shut up and not say anything he would not tie her up. She seemed to be passing out. Crawford noticed Hogue walking up and down the hall, and heard Renick begging Hogue to let them live and saying that he would be sure that she did not say anything if Hogue let them live. The discussion she heard came from the bedroom on the north side of the house adjacent to the one she was in. She started smelling the odor of gasoline, and smelled it for a long time. Then she saw Hogue backing down the hallway with something in his hand. He was pouring something over the hallway, going in the direction of the garage. A minute or so later she heard something ignite. The hall caught on fire, and the entire house seemed to explode. She managed to escape through a window. The flames were just behind her when she exited. She went next door to the neighbors' house, where she banged on the door and rang the doorbell. While there, she turned around and saw the lights on Hogue's car come on. The car was parked on the street that dead-ended into Southcrest. Because of a concern that he would see her, she ran from the neighbors' porch back to the area where she had exited through the window. Renick was outside the burning house, throwing his arms in the window of the room where Renick and Markham had been when the fire started. She heard Markham screaming. Crawford collapsed, she thinks. The next thing she remembers is when she was inside the neighbors' house, talking to the neighbors. She was in tremendous pain, and thought she was going to die. Renick came to where she was and told her that Jonathan was in the pickup. She kept asking about Markham, who she referred to as "Jaynie"; but Renick did not respond. She was removed from the scene by ambulance.

## B. *Witness Renick:*

Renick confirmed Crawford's testimony that he moved in the house at 2412 Southcrest to help Crawford and Markham with the rental payments. At approximately 1:00 a.m. on Wednesday, January 10, he and Markham were in the living room of the house when the doorbell rang. Hogue was at the door, and he introduced himself and said that he had lived in the house before and had left a calendar on the wall. A zodiac calendar had, in fact, been left on the living room wall. Renick gave the calendar to Hogue, who later left.

When Renick returned from work the evening of January 10, he saw a Lincoln automobile, which he learned was Hogue's, parked in the driveway of the house. When he entered the house, Hogue was visiting with Crawford, Markham, and Jonathan. They were discussing furniture Hogue said he wanted to sell. Apparently Hogue had already brought over items that Markham had purchased from him, including a couch. Hogue discussed with Crawford and Markham that he could find employment for them at the office where he worked. When Renick went to bed the evening of January 10, after he and Crawford had been out playing pool for two or three hours, Markham, Hogue, and Jonathan were in the house, putting furniture together and talking.

Thursday, January 11, when Renick returned home from work at around 5:30 or 6:00 p.m., he saw Hogue's car parked near the house. Hogue, Crawford, Markham, and Jonathan were in the living room. Renick confirmed the testimony of Crawford concerning events that occurred when the realtor came to the house that evening. After the realtor had left and all of the residents of the house but Renick had gone to bed, Hogue continued to stay at the house, and Renick and Hogue visited. Hogue asked Renick if he knew where Hogue could get a gun. Renick responded by saying that he had one; and, he obtained it from his truck and

showed it to Hogue. Renick cleaned his gun, a .22 automatic pistol, in Hogue's presence, and then put it in the footlocker in his bedroom, which he locked as Hogue watched. Shortly after that Renick went to bed. He does not know whether Hogue remained in the house that night.

The next morning, Friday, January 12, Hogue came into Renick's room, awakened him, and told him that it was time for him to go to work. When Renick returned home from work that evening he saw Hogue's vehicle parked near the house. He found the front door to the house locked. As he was searching for his key, the door came open. Hogue was in the doorway with both hands on Renick's gun, pointing the gun at him. Hogue handcuffed Renick and took him to the bedroom where the others in the house were situated. Renick's testimony basically confirmed Crawford's statements about events that occurred at that time and shortly thereafter. Renick confirmed that Hogue moved people from place to place in the house. At one point Hogue came to the place where Renick was located and pointed the gun at Renick and told him that he was going to blow Renick's brains out. Apparently Hogue was moving from one room to another at all times, checking on those in the house. At one point in the evening, Jonathan came into the room where Renick was handcuffed and read from a book. Whenever Hogue heard someone in the house talking, he immediately would go to the location of the conversation. Hogue finally put Markham in the room with Renick. At first, she was not tied up.

Renick was concerned that if they did not cooperate with Hogue he would kill them. Sometime during the evening he heard a muffled scream in another room and, then, someone vomiting. Hogue came into the room where Renick was and said that he had stabbed Crawford and that she was not going to make it. Markham went to try to help Crawford, and then came back into the room. After that Hogue tied Markham's hands behind her back, tied her feet, and then tied her feet to her hands. During this time Renick could hear Crawford in the adjoining

room, moaning and crying, off and on. When Renick pleaded with Hogue to let them go, he promised Hogue that, if he did, they would not say anything. About that time Hogue changed his story. Instead of saying he was a policeman, he now said that he was a hit man and that he was fulfilling a contract for someone in Wichita Falls who wanted them dead.

After Hogue had stabbed Crawford, Renick started smelling the odor of gasoline. He heard clunking sounds from the direction of the garage and heard Hogue cough and sputter. Later Hogue came into the room and said that the had decided to go ahead and kill them. Hogue had with him a Prestone antifreeze can and a rolled-up newspaper. He then walked toward Markham's bedroom. Renick then heard him walking back from there and heard liquid being poured as Hogue went backwards past the door from the hall to the room Renick was in. When that was occurring, Renick's hands and feet were bound with speaker wire. There was an intense odor of gasoline in the house at that time. A minute later, the hallway burst into flames. Renick pulled himself loose from his bindings. Markham was beside him at the time, in a crouched position because of the way she was tied. As soon as he untied himself, he broke the glass in the window with his hands and exited through the window. When outside, he saw Crawford outside the house with her hand over her abdomen, staggering. He went back to the window to try to get Markham out. She was screaming. He could not enter through the window because of the heat, but he stayed at the window until the screaming stopped. Then he went around to the other side of the house, to the window of the room where Jonathan was sleeping. He broke that window with his hands, yelled for Jonathan to come to him, and pulled Jonathan through the window when Jonathan responded. He took Jonathan to his pickup truck, and then ran to the next door neighbors' house, where he saw Crawford on the floor, right inside the doorway, with the neighbors standing over her. He wanted to go back into the burning house, and he requested a blanket

from the neighbor. The neighbor went with him, with a blanket, into the garage of the burning house, but Renick did not go in because he did not have any shoes on and there was hot sheetrock on the floor. The neighbor took the blanket and ran in but did not get very far before he came back. The fire was still roaring at that time. When the firemen arrived, Renick told them that there was a woman in the house and that the fire was not an accident. He told a policeman who came to the burning house that Hogue had set the fire. Renick was taken by ambulance to a clinic, where his wounds were stitched. He received twenty-seven stitches.

## C. *Witness Nix (Jonathan):*

Jonathan, who was ten years of age when he testified in March 1980, is the son of Markham. He related his recollection of the events that occurred after he returned home from school the afternoon of January 12 until he was rescued from the burning house by Renick the early morning of January 13. He had met Hogue earlier that week when Hogue had come several times to the house where he and his mother were living. When he, in the company of a friend, arrived home from school shortly after 3:00 p.m. on Friday, January 12, he asked his mother if he could go out and play with his friend. His mother did not respond, but Hogue spoke up and said that he could not do so. Jonathan's recollection is that Hogue explained to him that he was planning to arrest Renick for selling marijuana and that he did not want Jonathan to come home right in the middle of the arrest and run the risk of being shot if Hogue had to fire a shot. Jonathan told his friend to leave, and the friend left. At that time, Hogue, Markham, and Crawford were in the master bedroom. He saw a pistol in Hogue's hand while they were there.

When Jonathan heard Renick's truck at about 6:00 p.m., Hogue went to the front door with the gun. He heard Hogue tell Renick to get on the floor and "I am arrest-ing you for selling marijuana." S.F. Vol. 14, at 2882. Hogue brought Renick, who was handcuffed, back to the master bedroom. From there Hogue, who still had the gun, and Renick went to Crawford's bedroom. Sometime after that Jonathan went to Crawford's bedroom, where Renick was handcuffed to the headboard of the bed, and read Renick stories and helped him with his cigarettes. Every once in a while Hogue would stick his head in the door. After that, Jonathan went back to the master bedroom, watched TV for about an hour, turned the TV off, and called for his mother. In response to Jonathan's call, Hogue came to the room and told him that if he did not quit calling his mother Hogue was going to whip him. Jonathan then went to sleep. The next thing Jonathan recalls is of being awakened by breaking glass and Renick removing him from the room where he had been sleeping.

## D. *Witness Mr. Gamble:*

On January 13, 1979, Mr. Gamble resided at 2410 Southcrest, which is next door to 2412 Southcrest. He had met Hogue when Hogue lived next door to him in the latter part of 1978. Before January 13 he had not met the people who had moved into the house after Hogue moved out. The early morning of January 13 he was awakened in his bedroom, the outside wall of which was about twelve feet away from the outside wall of a bedroom at 2412 Southcrest, when he heard frantic ringing at the doorbell, glass breaking and shattering, and a voice "yelling and screaming for Jamie." [12] S.F. Vol. 10, at 2122. He saw that there was a fire outside his bedroom, and when he opened his curtains he saw fire pouring out the windows of the bedrooms at 2412 Southcrest nearest his bedroom window. His wife, who was in bed with him, made a phone call to the fire department as Mr. Gamble put on his robe and ran to the front door. When he arrived at the front door no one was there, so he went outside, and around the corner of his house, where he saw Crawford on her side on

---

**12.** The overall testimony leaves no doubt that the name he heard was "Jaynie" rather than "Ja-mie."

the ground, gasping, crying, and yelling. She was concerned about the people in the house and was saying words to the effect "Steve, where is the boy" and "where is Jamie"; and, she was screaming and yelling "Jamie." *Id.* at 2127. He picked her up and carried her into the front foyer of his house. While on the floor in the foyer, she said:

"I don't know why he stabbed me. I don't know why he did it. I don't know him."

*Id.* at 2129. She repeated several times "I don't know him." *Id.* Because Crawford obviously had been wounded, Mr. Gamble's wife called an ambulance. Crawford was gasping for breath and looked like she was going to die. Shortly after the ambulance was called, Renick came into the house. His "arms were cut up" and he "was bleeding from the arms." *Id.* at 2123. Renick was given a towel to wrap around his arms. He was "very keyed up, very upset and he knew that 'Jamie' was still inside the house and he wanted inside that house." *Id.* at 2031. Renick asked for a blanket; and, when Mr. Gamble returned from obtaining a blanket, Renick had left the house. Mr. Gamble followed Renick, and found him inside the garage of the burning house; and, Mr. Gamble could tell that Renick wanted to go into the house. Renick was yelling for "Jamie," and he asked Mr. Gamble to give him the blanket and Mr. Gamble's shoes. Rather than to do that, Mr. Gamble threw the blanket over himself and ran about six to eight feet into the burning house, going in through the garage entrance, when he realized the heat was too intense to go further. When he came out of the house, Renick was still excited and wanted to go into the house to get "Jamie." Mr. Gamble restrained Renick, and he concluded that he was going to have to knock Renick out to keep him from going into the house. They went to the front of the house while the fire was still raging. Apparently Renick realized that it was hopeless for him

to go into the house, and he seemed to release his frustrations by putting his fist through a front window of the burning house. Shortly thereafter the fire trucks arrived. Mr. Gamble told the firemen that there was a woman in the house. Then he went back to where Crawford was lying on the floor of his house. Renick joined them. Mr. Gamble remembers that shortly after the police arrived he heard Renick say to Crawford, "What should we tell the police? What should we tell people?" *Id.* at 2137. And, he heard Crawford respond, "We'll tell the truth. We will tell what happened."[13] *Id.* About that time a police officer came to the front door. That was the last time Mr. Gamble saw Renick. He and his wife remained with Crawford until the ambulance arrived. When Crawford left she was conscious, but was gasping for air, wanted water, and was very upset.

### E. *Witness Mrs. Gamble:*

Mrs. Gamble had seen the Hogues when they lived at 2412 Southcrest. She knew in January 1979 that the Hogues had moved out and that four people had moved in, Renick, Markham, Crawford, and Jonathan. She was awakened the early morning of January 13 by the breaking of glass and screaming. There was a fire next door. By use of a phone by her bed, she called the fire department. About that time their doorbell sounded, and her husband went to the door. By the time she went to the front of the house, Crawford was on the floor in their house, in shock, in a lot of pain, and hysterical. Mrs. Gamble called an ambulance, and then returned to Crawford. Crawford expressed concern about her friend, and she "kept asking where they were at." *Id.* at 2169. Crawford asked Mrs. Gamble to look at her stab wound and said, "I don't understand why he did this to me. I don't even know him." She was having difficulty speaking or breathing, but she was mentioning the names "Jamie"[14] and "Jonathan." Mrs. Gamble

---

**13.** The court is puzzled by this exchange between Renick and Crawford, but, in balance, when all the testimony is considered, the court has concluded that the exchange does not form basis for a reasonable doubt as to the criminal conduct for which Hogue was convicted.

**14.** Again, the context makes apparent that the name "Jaynie" rather than "Jamie" was being spoken.

and Crawford prayed the Lord's Prayer while waiting for the ambulance to arrive. Before the ambulance arrived, Renick came into the house, and asked Crawford, "What do we tell them?", to which Crawford replied, "The truth, of course." *Id.* at 2171.

## F. *Witness Brammall:*

Brammall was a captain with the Fire Department of the City of Arlington in charge of the station that responded to the fire at 2412 Southcrest the early morning of January 13. The fire alarm came in at approximately 1:14 a.m. He and his fire crew arrived at the fire five or six minutes later. By the time he arrived, the house appeared to be fully involved. After forcing the locked front door open, he went down the hall ten or fifteen feet, but the heat was too intense to go further. He then entered the back of the house through a sliding glass door, which was wide open. Because of conversation he had with a person outside the house, he was looking for a body when he went into the house as other firemen were fighting the fire with high pressure hoses. In order to move through the burning house, he had to crawl beneath the smoke and use a flashlight. By that means he found a body, which "looked like a piece of burned meat." *Id.* at 2194.

## G. *Witness Shetler:*

On January 13, 1979, at approximately 1:00 a.m., Shetler, a police officer for the City of Arlington, received a radio dispatch that caused him to go to the burning house at 2412 Southcrest. When he arrived, two fire units were at the scene fighting the fire. He was the first law enforcement officer at the scene. Based on a conversation he had with one of the firemen, he went to the residence of Mr. and Mrs. Gamble, where he saw Crawford lying on the floor and Renick standing over her. Renick's hair, eyebrows and beard were singed, and he was bleeding from cuts on both arms. Shetler and Renick stepped out onto the front porch, where Renick told him that a white female was left tied up in the house and that a man by the name Jerry Hogue had set the house on fire. Ren-

ick described Hogue, and told Shetler that Hogue had departed in a light colored Lincoln Continental. After putting out a general broadcast on his radio for other officers to be on the lookout for the vehicle and Hogue, Shetler had further discussion with Renick, who told him of events that had occurred at the burning house from the time Renick had arrived home from work through the point in time when he rescued Jonathan. The things Renick told Shetler are consistent with the testimony Renick gave at the trial. Crawford and Renick were removed from the scene of the fire in separate ambulances. Neither Renick nor Crawford was arrested because neither of them was considered to be a suspect, and each of them was considered to be a victim.

## H. *Witness Cowsert:*

Cowsert, a police officer employed by the City of Arlington, conducted a search of the burned house after the fire was extinguished. He described locations of fire damage and said that Markham's body was found in the middle room on the north side of the house, near the north wall. He was the first to find in the burned house a Prestone anti-freeze container, which he found in a laundry room. The container had the odor of gasoline. Also, he found two sections of garden hose inside the garage of the burned house. The cut end of the hose had the odor of gasoline.

## I. *Witness Kraus:*

Kraus, who in January 1979 was employed as a pathologist by the Tarrant County Medical Examiner's Office, participated in the performance of the autopsy on Markham's body. The hands of the body were bound behind the back of the body and the feet were bound. Insulated wire was used for the bindings. Death was caused by asphyxiation due to inhalation of smoke and carbon monoxide.

## J. *Witness Liggett:*

Witness Liggett saw Crawford in the emergency room when she was brought to the hospital the morning of January 13. She

had a penetration wound to her abdomen, which had penetrated into her bowel and colon. If she had not received medical attention, she could have died from the wound.

### K. *Witness Gibson:*

On January 13 Gibson was a fireman employed by the City of Arlington. He identified a Prestone anti-freeze container that was found in the utility room of the burned house when the house was searched after the fire was extinguished. The interior of the Prestone container had the odor of gasoline. Gibson also identified a section of hose that was found in the garage of the burned house. The hose had the odor of gasoline. During the daylight hours of January 13 he used a combustible gas detector at the burned house and studied the pattern of burning. The detector indicates whether a flammable liquid was used to accelerate a fire. In his opinion, the fire was a petroleum-type fire, *i.e.,* a fire caused by a petroleum product. The fire, in his opinion, was deliberate arson. He expressed the opinion that the general area of the origin of the fire was the hallway in the house. In his opinion, gasoline had been present from just inside the garage door all the way up the hall to the master bedroom.

### L. *Witness Beaty:*

Beaty is the real estate broker who had handled the rental of the house at 2412 Southcrest to Hogue and his wife in early November 1978. In early December 1978 he learned that Hogue had abandoned the premises; and, on December 24 he rented the premises to Crawford and Markham. On January 11, 1979, he went to the house for the purpose of attending to details of the lease transaction Crawford and Markham were entering into. When he arrived, the persons present in the house were Crawford, Markham, Renick, and Jonathan. He was at the house at approximately 5:30 or 6:00 p.m. While there, he did not see Hogue.

### M. *Witness Megason:*

Megason, a police officer employed by the City of Arlington, participated in the arrest of Hogue at about 1:10 a.m. on January 14 in an upstairs apartment in a two-story apartment building in Arlington, Texas. All the lights were out in the apartment when the officers entered. As they entered, they announced that they were police officers and that they were entering to look for "Jerry Lee Hogue." They received no answer. The apartment was a small apartment, and anyone in the apartment could have heard his voice when he went through the front door and said that he was looking for Hogue. There was no one in the living room area or the bedroom. When he turned the light on in the bathroom, he noticed movement behind the bathroom sliding partition. He slid the partition back, and Hogue was there. They did not find a gun or handcuffs when they searched Hogue, who was fully clothed at the time.

### N. *Witness Johnson:*

After January 13, apparently on January 14, Johnson, a police officer with the City of Arlington, with the consent of Hogue, who had been arrested by then, searched Hogue's Lincoln automobile. It was parked behind a bar located in a building off the North–South Freeway in Fort Worth. He found in the trunk a blue suitcase, which contained, among other things, a box of .22 shells, a shaving kit with a shaving razor in it, and three pair of blue jeans.

### O. *Witness Watkins:*

Watkins manages a pawn shop in Arlington, Texas. He identified a record of his pawn shop that showed the purchase of a pair of Smith & Wesson handcuffs on January 2, 1979. He had a personal recollection of the transaction. The purchaser was Hogue, whom he identified in the courtroom.

### P. *Hogue's Defensive Theory:*

Capitalizing on evidence that illegal drugs were possessed and used by some of the residents of the house at 2412 Southcrest,

Hogue related to a version of events that, when weighed against the other evidence in the case, is so lacking in credibility that no reasonable trier of facts would accept it.

Hogue testified that after he met Markham when he went by the house to retrieve the zodiac calendar, and during visits he had with her prior to January 12, 1979, he learned that Markham was of the belief that Renick was distributing illegal drugs from the house, was dissatisfied with his presence in the house, and was seeking to cause his removal from the house. According to Hogue, Markham solicited his advice on what to do about Renick. Hogue painted himself as a protector of Markham. His rendition of events at the house on January 12 and the early morning of January 13 was virtually a reversal of the roles other witnesses assigned to Hogue and Renick. Hogue testified that Renick, not Hogue, is the one who was using the gun and moving people from one place to another in the house, who stabbed Crawford, who caused gasoline to be siphoned from a vehicle in the garage into the Prestone container, who bound Markham and put her in the bedroom, and who set the house on fire. According to Hogue, Renick tied him to the bed in the room where Markham had been placed in a bound condition. His version is that he freed himself after Renick started pouring gasoline in the house, that he was in the process of untying Markham's bindings when Renick came into the room and he and Renick struggled, that he ran from the house, through the garage door, and had just reached the pavement of the street when the house went up in flames, and that when he looked back at the house he saw a figure standing on the side of the house, which he took to be Renick. According to Hogue, he then ran to his car, and left.

The court is satisfied that Hogue's version was a complete fabrication, except to the extent that he wove into his version facts that he must have known could not be discredited and would have to be taken into account or that served as an element of his version.

V.

## EVIDENCE RECEIVED AT THE PUNISHMENT PHASE OF HOGUE'S TRIAL

The state trial court instructed the jury before it began its deliberations at the punishment phase of Hogue's trial that it could take into consideration all the evidence submitted to it during the guilt/innocence phase of the trial as well as all evidence admitted before the jury during the punishment phase. Tr. 73. The additional evidence received at the punishment phase is as follows:

A. *Witness White:*

White, a Deputy Sheriff of Tarrant County, Texas, identified as having been made by Hogue the fingerprints on records pertaining to the conviction and sentence of Hogue in Colorado. Through this witness, the records, marked State's Exhibit 52, were put in evidence.

B. *Witness Diezei:*

Diezei, a Lieutenant Detective for the Boulder, Colorado, police department, testified that he had occasion to know the reputation of Hogue in that community for being a peaceful and law-abiding citizen, that he first heard of Hogue in approximately 1970, and that Hogue's reputation for being a peaceful and law-abiding citizen was bad.

C. *Witness Samson:*

Samson, who was from out-of-state, met Hogue about ten years prior to the trial. She knew his reputation for being a peaceful and law-abiding citizen in the community where she knew him. His reputation was bad.

D. *Witness Hightower:*

In July 1976 Hightower, and her sixteen-month-old daughter, resided at an apartment complex in North Richland Hills, Texas. At that time her name was Karen Wilson. She first saw Hogue, whom she identified in the courtroom, on July 25, 1976, in the parking lot of her apartment complex, where she was

having trouble starting her car. Hogue, by use of his jumper cables, helped her start the car. He gave her his name and told her she could keep the jumper cables until she had her car fixed; and, he said he would return to pick the cables up. She told him where she lived in the apartment complex. Thereafter, Hogue showed up from time-to-time unannounced, and uninvited, at her apartment, on occasion waiting for her to return from work. She went out socially with Hogue. He represented himself to be an expert in karate; and, at his suggestion, she and a girl friend of hers took karate instructions from Hogue.

On August 2, 1976, Hogue told her by telephone that he wanted his jumper cables back and that he would come by and pick them up; and, he said that to ensure that they would part as friends they would go get a hamburger and then he would take her to meet his uncle. By then she had decided that she did not want to continue her relationship with Hogue. When he arrived at the apartment to obtain the jumper cables, she told him that she did not want to see him again but that she would go with him to have a hamburger and to meet his uncle, who, Hogue said, was expecting them. Prior to that day they had discussed their relationship, and Hogue wanted them to continue to be friends and became angry when she had first told him that she did not want to see him again.

Hogue explained to her that his uncle had a cabin out of the city, near the lake. In the course of purportedly going to his uncle's cabin, he drove over unpaved roads into a wooded area, where he told her to get out of the car and that he was going to rape her. Hogue had a long, straight-edged knife, which he held at her back when he told her to exit from the passenger side. He followed her by sliding across the seat; and, he kept knife at her back as he took her over a fence and into the woods. Hogue repeatedly told her that he was going to kill her with the knife. He first made her perform oral sodomy on him, and then he raped her, both of

which acts he then repeated. After he finished the sex activities, he told her he was going to kill her because she would be able to testify against him if he let her live. After she begged him, he decided not to kill her, and subsequently took her back to her car.

On cross-examination, Hightower was asked impeachment questions related to a 1978 conviction she had for fraud and about events related to a state court criminal action brought against Hogue arising out of his assault on her, which was not successfully prosecuted.

### E. *Witness Grigson:* [15]

Grigson is a medical doctor with a specialty in psychiatry. He has examined hundreds of persons charged with the offense of murder, over 200 in the seventeen months preceding the giving of his testimony. From those examinations he feels that he is qualified to form an opinion as to whether a person is dangerous. In answer to a hypothetical question, which was based on evidence that was before the jury, he testified that the man described in the hypothetical question would be a continuing threat to society and would be a danger to others, even in a penal institution. Grigson testified that he can say with almost 100 percent certainty that the man described in the hypothetical question will commit future acts of violence.

Grigson was cross-examined concerning disagreements he has had with the American Psychiatric Association relative to his practice of giving testimony as to future dangerousness in answer to hypothetical questions.

### F. *Witness Becky Hogue:*

Becky Hogue, apparently unrelated to Hogue, testified that she had known witness Hightower since 1976 or 1977 and that Hightower's reputation was very bad.

### G. *Witness Dickerson:*

Dickerson, who is a licensed psychologist, was employed as the Chief of the Psychologi-

---

**15.** This witness' name was spelled "Gregson" from time-to-time in the state court records.

cal and Mental Health Services for the Texas Department of Corrections from January 1, 1974, through February 17, 1978, before he entered private practice on a full-time basis. He was questioned by counsel for Hogue on the subject of predictability of a person committing criminal acts of violence in the future. Dickerson said that predictions given of future dangerousness prove to be wrong about two out of three times. He gave testimony concerning treatments that have been used to inhibit future misconduct by sex offenders. He, in effect, criticized witness Grigson's testimony by saying that the Judicial Action Committee of the American Psychiatric Association has taken the position that any health care professional who attempts to predict to a certainty that a given individual will perform specific acts of criminal violence in the future has exceeded his professional capacity and has verged on not only professional incompetence but unethical behavior.

On cross-examination by the prosecution, Dickerson said that he had not examined Hogue, though he had the capability to do so. He discussed during cross-examination the attributes of a sociopath and the likelihood that a sociopath who had been imprisoned would kill witnesses in order to avoid going to prison again.

When recalled as a witness by Hogue's counsel, Dickerson recounted his experience with the Texas Board of Pardons and Paroles, both while he was an employee with the Department of Corrections and since then. He said that he had never recommended to the Board that a person be released on parole because of his belief that such a recommendation would usurp the Board's privilege. According to him, over the last two years parole had become increasingly more difficult to obtain. The Board had evidenced a very high degree of reluctance to grant parole to someone with a history of having done what Hogue is accused of having done. On cross-examination

he acknowledged that most murderers who receive life sentence make parole.

### H. *Witness Ebel:*

Hogue is witness Ebel's youngest son. She identified Hogue, his ex-wife, and his ex-wife's daughter in photographs that were taken in 1976 at the Colorado State Reformatory. They were taken after Hogue had pleaded guilty in Colorado and had been sent to the reformatory. She said that the ex-wife was the victim in the rape case that caused Hogue to be in the reformatory. The witness provided transportation to the ex-wife to visit Hogue at the reformatory because the ex-wife did not have another way to go.

## VI.

### *THE GROUNDS OF THE PETITION*

#### A.

##### *Preliminary Statement*

As originally filed, Hogue's petition asserted thirty-three grounds in support of his request for habeas relief. By an amended petition Hogue added two grounds, grounds 34 and 35.[16] He represents that grounds 1 through 13, 34, and 35 are grounds that were raised in, and denied on the merits, by the Court of Criminal Appeals of Texas before it ruled that the contentions he made in his fifth application for writ of habeas corpus in the state court were not only without merit but had been waived and abandoned by his abuse of the writ of habeas corpus. Petition at 16–17, 25 n. 15. According to Hogue, his grounds 14 through 33 are ones the Court of Criminal Appeals of Texas refused to address on the merits because of its ruling that Hogue had abused the writ of habeas corpus and because, presumably, it did not find that Hogue demonstrated "good cause" for filing a subsequent application that raised those grounds. *Id.* at 17, 106 n. 53. Under this main heading, the court is giving consideration to each of Hogue's grounds, in some

---

**16.** His ground 35 is incorrectly designated with a "XX". Amended Petition for Writ of Habeas

Corpus at 6.

instances grouping them for discussion. But, first the court (a) notes that lack of exháustion of state court remedies is not an impediment to consideration by the court of all Hogue's grounds for relief and (b) explains why it has concluded that the procedural default rule prevents Hogue from successfully asserting grounds that the state court had not considered before the ruling was made that Hogue had abused the writ of habeas corpus.

## B.

### *Respondent has Waived Exhaustion*

■ As a general rule, no ground raised by an application for writ of habeas corpus in federal court will be considered unless the applicant has first exhausted all available state court remedies, or circumstances exist which render the state corrective process ineffective to protect the inmate's rights. *Ex Parte Royall,* 117 U.S. 241, 251–52, 6 S.Ct. 734, 740–41, 29 L.Ed. 868 (1886); 28 U.S.C. § 2254(b). A federal district court should dismiss a habeas petition that contains any unexhausted claims. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982). However, exhaustion is not a jurisdictional requirement, but a matter of comity. *Id.* Therefore, the state may waive the exhaustion requirement by failing to assert the defense of non-exhaustion. *McGee v. Estelle,* 722 F.2d 1206, 1211–14 (5th Cir.1984) (en banc).

■ Respondent has contended that the exhaustion requirement was not satisfied as to one or more of the grounds of the petition. Respondent's Answer and Motion for Summary Judgment ("answer") at 14, 18. However, in a telephone conference between the court and counsel held October 31, 1994, the court was informed by counsel for respondent that the state waives the exhaustion requirement as to any grounds asserted by Hogue that have not been exhausted through the state court. While the court is not bound to accept such a waiver, *id.* at 1214, and *Resendez v. McKaskle,* 722 F.2d 227, 229–31

(5th Cir.1984), the court is accepting the waiver in this case.

## C.

### *The "Abuse-of-the-Writ" Determination Bars Hogue from Asserting Grounds 14–33*

■ Respondent maintains that Hogue is prevented by the procedural default rule from urging grounds 14–33 of his petition because the state court refused to consider those grounds due to Hogue's abuse of the writ of habeas corpus in the state court. Answer at 18. Hogue concedes that grounds 14–33 were not considered by the state court because of its abuse-of-the-writ ruling. Petition at 16–17, 106 n. 53. The *per curiam* order of the Court of Criminal Appeals of Texas by which the state court made its abuse-of-the-writ determination reads in its entirety as follows:

### *ORDER*

This is a post conviction application for writ of habeas corpus filed pursuant to the provisions of Article 10.07, V.A.C.C.P.

Applicant was convicted of the offense of capital murder. After finding applicant guilty, the jury returned affirmative answers to the special issues submitted under Article 37.071, V.A.C.C.P. Applicant's conviction was affirmed on direct appeal. *Hogue v. State,* 711 S.W.2d 9 (Tex.Crim. App.1986)

In the instant cause, applicant presents five (5) allegations. All of the allegations have been raised and rejected either on direct appeal or in previous applications for writ of habeas corpus.

This application, however, presents a more serious question. This Court's records reflect that in addition to his direct appeal, the applicant has filed [four] previous applications challenging this conviction.

It is obvious from the record that the applicant is continuing to raise issues which could have been presented or were rejected in his previous applications. The

writ of habeas corpus is too serious and important a matter to be lightly and easily abused. See *Ex parte Carr,* 511 S.W.2d 523 (Tex.Cr.App.1974); *Sanders v. United States,* 373 U.S. 1 [83 S.Ct. 1068, 10 L.Ed.2d 148] (1963). See also, *Smith v. Estelle,* 562 F.2d 1006 (5th Cir.1977); *McDonald v. Estelle,* 590 F.2d 153 (5th Cir. 1979); *Potts v. Zant,* 638 F.2d 727 (5th Cir.1981); *Henson v. Estelle,* 641 F.2d 250 (5th Cir.1981) (delayed applications).

If an applicant has grounds which would justify the granting of habeas corpus relief, he should present them for determination with dispatch, rather than doling them out one-by-one in repeated attempts to obtain relief.

We hold that the applicant's contentions are not only without merit but have been waived and abandoned by his abuse of the writ of habeas corpus.

Therefore, the Honorable Thomas Lowe, Clerk of the Court of Criminal Appeals, is not to accept or file the instant application for writ of habeas corpus. He is also instructed not to accept in the future any applications for a writ of habeas corpus attacking this conviction unless the applicant has first shown that any contentions presented have not been raised previously and a showing is made that they could not have been presented in any earlier application for habeas corpus relief. *Ex parte Dora,*[1] 548 S.W.2d 392 (Tex.Cr.App.1977); *Ex parte Bilton,* 602 S.W.2d 534 (Tex.Cr. App.1980).

IT IS SO ORDERED THIS THE 18TH DAY OF SEPTEMBER, 1991.

### PER CURIAM

1. In *Ex parte Dora,* this Court explained the duty of the trial court after the entry of an abuse order as follows:

Where a petitioner has been previously cited for an 'abuse of the Great Writ', the trial court should not thereafter consider the merits of any application for writ of habeas corpus filed by that petitioner. The trial court should, however, review the application and make findings that this petitioner has abused the writ in the past, and thus making the review procedure of this court more efficient. The transcript should be forwarded to this Court, just as in all other cases, pursuant to our automatic review jurisdiction. See Art. 11.07, § 2(a), supra. The writ transcript should, of course, be forwarded to this court within fifteen days of the trial court's order. See Art. 11.07, § 2(c), supra.

9/18/91 *per curiam* order in No. 16,907–05 of the Court of Criminal Appeals of Texas. The events that led up to the *per curiam* order are discussed in section III, under the heading "Course of Proceedings and Dispositions in State Court and in Prior Federal Court Actions Instituted by Hogue," of this memorandum opinion and order.

1. *Other Potentially Pertinent Procedural Events:*

Other procedural occurrences that have possible relevance to the abuse-of-the-writ determination and respondent's contention that there was a procedural default related thereto are as follows:

At a hearing held by the state trial court on May 2, 1991, the state trial court, at the request of Hogue, appointed Phyllis Crocker ("Crocker") as his counsel for the purpose of representing Hogue on his application. Crocker was given 120 days within which to convert the *pro se* application Hogue filed March 22, 1991, to an application filed by counsel. On September 3, 1991, before the abuse-of-the-writ order was made, Crocker tendered for filing in the state court on Hogue's behalf another application for writ of habeas corpus. 6th State Habeas Tr.[17] at 2. This application presented thirty-six grounds for relief. *Id.* at 2–173. On October 3, 1991, Hogue, through Crocker, filed an instrument titled "Motion for Additional Briefing" by which Hogue sought sixty days within which to file a brief on the procedural posture of "this Application." *Id.* at 517, 518. On October 17, 1991, the state trial court signed an order, apparently pertaining to the September 3 application, by which the state trial court expressed its conclusion that the state court should consider the merits of three

---

17. The reference "6th State Habeas Tr." is to the four-volume transcript (Volumes 1, 1A, 1B and 1C) pertaining to C–3–1647–16241–F that shows to have been delivered to the Court of Criminal Appeals of Texas on March 11, 1992.

allegations "which have not been and could not have been raised in previous proceedings"; and, the court ordered that the hearing on those grounds should be by affidavit only. *Id.* at 523, 524.

On November 13, 1991, Hogue, acting through Crocker, filed a motion for reconsideration, asking the state trial court to reconsider actions it took in the October 17 order. *Id.* at 531. By this motion Hogue argued that the three allegations to which the state trial court referred in the October 17 order did not accurately reflect grounds raised by Hogue in the petition he filed September 3, *id.* at 534; and, Hogue requested that he be given an opportunity to make a showing of good cause for raising claims not previously raised before the state court, *id.* at 537. As Hogue had urged in his motion for reconsideration, the state trial court signed an order that redefined the three allegations that had been mentioned in the October 17 order to cause them to "mirror those raised by Mr. Hogue in his present Petition for Writ of Habeas Corpus." *Id.* at 541. Otherwise, the state trial court overruled the motion for reconsideration. *Id.*

On November 19, 1991, the prosecutor filed his reply to the application that had been filed on September 3, taking into account the state trial court's order defining the issues to be considered. *Id.* at 551. On December 10, 1991, Hogue, acting through Crocker, filed in the state trial court proposed findings of fact and conclusions of law. *Id.* at 705. Hogue also filed on December 10 an instrument titled "Motion to Permit Filing of Instant Application for Post–Conviction Writ of Habeas Corpus," *id.* at 725, which was denied by the state trial judge, *id.* at 726. On December 12, 1991, the prosecutor filed in the state trial court proposed findings of fact and conclusions of law apparently related to the three claims the state trial court had defined by the order signed October 17, 1991.

By order signed March 6, 1992, the state trial court adopted the prosecutor's proposed findings of fact and conclusions of law, as amended by the court. *Id.* at 1035. The record of the proceedings related to the application Crocker filed for Hogue on September 3, 1991, were delivered to the Court of Criminal Appeals of Texas on March 11, 1992. *See* date of delivery noted on face of each volume of the 6th State Habeas Tr. By letter of March 16, 1992, from the Court of Criminal Appeals of Texas, acting through its Executive Administrator, to the state trial judge, the state trial court was reminded that on September 18, 1991, the Court of Criminal Appeals of Texas had entered an order citing Hogue with abuse of the writ and advising that the "present application does not satisfy the requirements for consideration set out in the [September 18, 1991, order]" and that "[t]herefore, this Court will take no action on this writ." March 16, 1992, letter from Court of Criminal Appeals to Honorable Don Leonard.

### 2. Analysis Related to the "Abuse–of–the–Writ" Issue:

 Where a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for his default and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice.[18] *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2564, 115 L.Ed.2d 640 (1991). A state procedural rule, however, is not entitled to respect as an adequate and independent state ground unless the procedural rule is strictly or regularly followed. *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Wheat v. Thigpen*, 793 F.2d 621, 624 (5th Cir.1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987). In other words, state

---

**18.** To show a fundamental miscarriage of justice, Hogue must demonstrate by clear and convincing evidence that but for constitutional error no reasonable juror would find him eligible for the death penalty under Texas law. *Sawyer v. Whit-* ley, —— U.S. ——, ——, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992). This is also referred to as the "actual innocence" requirement. *Id.* at ——–——, 112 S.Ct. at 2522–23; *Coleman*, 501 U.S. at 748, 111 S.Ct. at 2563.

courts may not avoid deciding federal issues by invoking procedural rules that are not applied even-handedly to all similar claims and that are not clearly announced to defendant and counsel. *Wheat,* 793 F.2d at 625.

On May 19, 1992, Hogue filed a memorandum regarding the procedural posture of his claims in which he maintains that none of his claims are barred by abuse of the writ. Respondent's sole response to this nineteen-page memorandum is contained in a single paragraph buried in respondent's November 2, 1992, answer. Answer at 18. The court is disappointed that respondent would devote such little attention to such an important matter.

Having conducted its own research, the court is satisfied that the claims set forth in part B of the Claims for Relief section of Hogue's petition, that is, grounds 14–33, are barred by Hogue's abuse of the writ. *See Hicks v. Scott,* 35 F.3d 202 (5th Cir.1994). Hogue's argument that the Texas courts do not consistently and humanely apply the abuse of the writ rule is a red herring, because the cases he cites do not give reasons for determining whether to apply the rule at certain points. The fact is that Hogue was on notice that he could be cited at any time for abuse of the writ. *See Ex Parte Dora,* 548 S.W.2d 392, 394 (Tex.Crim.App. 1977); *Ex Parte Carr,* 511 S.W.2d 523 (Tex. Crim.App.1974). The practice was clearly established at the time Hogue was filing various writ applications. Moreover, as noted, *supra* at 1498–1499, this court, through Judge Belew, ordered Hogue to assert in the next application he filed each ground known to him or his counsel on penalty of waiver if he failed to do so. The message could not have been more clearly conveyed to Hogue that, if he did not raise all grounds of relief in the next application for writ of habeas corpus he filed, whether in state court or federal court, he was running the risk that any he did not raise would be forever lost.

After Judge Belew's order was made, and before the filing of the application that resulted in the abuse-of-the-writ order, Hogue filed a fifth application for writ of error, his

fourth in state court, and yet another, his second, in federal court. Thus, there can be no puzzlement over why the Court of Criminal Appeals of Texas decided when it did that Hogue's conduct was abusive of the Great Writ. Indeed, another case of a defendant and his counsel so abusing and manipulating the writ process would be difficult to find.

Hogue has not proffered any acceptable cause for the conduct that resulted in the abuse-of-the-writ ruling, nor do the documents he has filed with this court allege any valid cause for the default he has suffered by reason of his abusive conduct. Furthermore, Hogue has not alleged any facts that, if proved, would constitute a demonstration by clear and convincing evidence that but for constitutional error no reasonable juror would find him eligible for the death penalty under Texas law. He has stated no facts that would support a conclusion that application of the procedural default rule because of his abuse of the writ would cause him actual prejudice or result in a fundamental miscarriage of justice. Those are issues to which the court will return from time-to-time at later points in this memorandum opinion and order.

Therefore, Hogue is procedurally barred from asserting in this court grounds 14 through 33 of the petition. Nevertheless, and without intending to relieve Hogue of the consequences of his abusive conduct, the court is considering each of those grounds for the purpose of demonstrating, alternatively, that, in any event, there would be no reason why Hogue should be given *habeas* relief.

### D.

*Hogue's Grounds Related to his 1974 Colorado Conviction are Without Merit*

The 16th and 17th grounds of Hogue's petition read as follows:

16. THE STATE KNOWINGLY PRE-SENTED A FALSE PICTURE OF

MR. HOGUE'S GUILTY PLEA TO RAPE IN COLORADO.

Petition at 113.

17. THE ADMISSION OF MR. HOGUE'S VOID PRIOR CONVICTION AT THE SENTENCING PHASE VIOLATED RIGHTS GUARANTEED BY THE U.S. CONSTITUTION.

*Id.* at 117.

These two grounds are included in those Hogue says the Court of Criminal Appeals of Texas refused to address on the merits because of Hogue's abuse of the writ of habeas corpus. Contrary to Hogue's contentions, *see* Memorandum in Support of Petitioner's Claim under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (filed 6/24/94) at 11–29,[19] Hogue's 1974 Colorado conviction played a relatively insignificant role, both pre-conviction and post-conviction, in his proceedings until June 1994 when Hogue's counsel were successful in persuading a judge of the Colorado court to set aside Hogue's plea of guilty and conviction of twenty years earlier,[20] *see* Notice of Judicial Determination that Petitioner's Prior Felony Conviction is Vacated as Void and Submission of Judgment and Order Vacating Prior Conviction as Evidence in Support of Petitioner for Writ of Habeas Corpus (filed 6/7/94), Ex. "A".[21] Hogue maintains that ground 17 of his petition encompasses the relief he now seeks on the basis of the recent action of the Colorado court. *Id.* at 2. As

the court demonstrates below, there are multiple reasons why the mentions of the Colorado conviction at Hogue's trial do not provide a meritorious ground for relief.

1. *The roles Hogue's Colorado conviction played in his state court trial proceedings:*

On March 24, 1980 Hogue, through his trial attorneys, Frank Coffey ("Coffey") and Robert C. Roe, Jr. ("Roe"), filed a motion asking for a hearing on the admissibility of his conviction in Case No. 6785, styled "State of Colorado vs Jerry Lee Hogue". Tr. at 36. There was no assertion in the motion that there was any irregularity in the Colorado proceeding or that Hogue was not guilty of the offense for which he was convicted in Colorado. Instead, the sole ground of the motion was that the punishment in the Colorado case was suspended and Hogue was placed on probation, which was successfully completed and terminated in January, 1977. *Id.* The motion was reurged during the trial, before any mention was made in the presence of the jury of Hogue's conviction. S.F. Vol. 14 at 2896–97. In support of the motion, the state trial court received as evidence, out of the presence of the jury, an exhibit Hogue's counsel offered for the purpose of making proof of the parts of the record of the Colorado criminal action upon which Hogue relied in support of his motion. *Id.* at 2908–09; Ex DX–A (which is inserted between pages 2911 and 2954 of S.F. Vol. 14).[22]

**19.** Most of the examination and arguments to which Hogue refers in his memorandum are predicated on proved conduct of Hogue that had nothing to do with his Colorado conviction.

**20.** As the court must, because of the Colorado court's reversal of Hogue's Colorado conviction, the court presumes that Hogue is innocent of the offense of which he was convicted on his plea of guilty in 1974. However, the court cannot avoid skepticism of the Colorado proceedings by which the conviction was set aside. There appears to be little room for doubt that the order of the Colorado court had as its goal providing assistance to Hogue in this habeas corpus proceeding. The text of the Colorado court's June 6, 1994, opinion is so directed to that end that it has the appearance of having been authored by Hogue's habeas counsel. *See, e.g.,* pages 15–17 of the Colorado court's opinion (Exhibit "A" to the document filed June 7, 1994, by Hogue titled "Notice of Judicial Determination that Petition-

er's Prior Felony Conviction is Vacated as Void and Submission of Judgment and Order Vacating Prior Conviction as Evidence in Support of Petition for Writ of Habeas Corpus").

**21.** According to an item filed by Hogue October 5, 1994, the Colorado prosecutor has abandoned the appeal from the order setting aside Hogue's plea of guilty and conviction. Notice that the Colorado Court of Appeals has dismissed the Colorado Prosecutors' Appeal of the Decision Vacating Mr. Hague's Prior Conviction, Ex. "A".

**22.** The exhibit shows that: Hogue was indicted in Case No. 6785 in a District Court of Boulder County, Colorado, in March 1974 on eight counts, Count 1 first degree kidnapping, Count 2 second degree kidnapping, Count 3 rape, Count 4 assault in the first degree, Count 5 theft over $100, Count 6 theft over $100, Count 7 intimidating a witness, and Count 8 assault in the third

There is no indication in Exhibit DX–A that Hogue ever maintained his innocence of the offense of which he was charged. Rather, the records of the Colorado court that make up the exhibit reflect that Hogue admitted that he was guilty of the crime of rape.

When Coffey and Roe were presenting their motion relative to the Colorado conviction to the state trial court, they did not assert that Hogue was innocent of the crime of rape, or that there was any irregularity in the Colorado proceedings, but only that Hogue's conviction was not useable for impeachment purposes because his sentence in Colorado was suspended and he was placed on probation for a period of ten months in December 1976. S.F. Vol. 14 at 2896–98, 2904–05. In support of his motion related to the Colorado conviction, Hogue elicited testimony, out of the presence of the jury, from a probation officer of Tarrant County, Texas, who had supervision over Hogue on referral from the Colorado court. The witness testi-

fied that he terminated his participation in Hogue's supervision when the Texas authorities returned Hogue's papers to the State of Colorado for legal action after Hogue had failed to comply with his conditions of probation. *Id.* at 2954–58. Hogue's counsel argued that there was not a final conviction in the Colorado action by reason of the order suspending his sentence and placing him on probation and that, therefore, under Texas law the Colorado conviction could not be used against him. *Id.* at 2960–61. The state trial judge then made findings, and ruled, that Hogue had received a final conviction in Case No. 6785, having pleaded guilty to the felony offense of rape in Colorado, having been found guilty, and having been sentenced for that offense. *Id.* at 2961–62.

The only mentions made of the Colorado conviction before the jury during the presentation of evidence at the guilt/innocence phase of the trial were questions the prosecutor asked Hogue on cross-examination

degree. The victim in counts 1, 3, 4, 5, 6, and 7 was Claudia Hogue, and the victim in counts 2 and 8 was Shawna Hogue. Count 1 was amended to charge second degree kidnapping. Apparently Case No. 6785 was consolidated for trial with other cases pending against Hogue in the same court. On August 19, 1974, Hogue appeared before the Colorado court and entered a plea of guilty to Count 3, the count charging him with rape; and, the court found him guilty on the basis of that plea. At the same time, the remaining counts in Case Nos. 6785 were dismissed, as were all charges pending against Hogue in Case Nos. 6534, 6322, 6324, and 6325. By judgment signed September 23, 1974, the Colorado court denied Hogue's request for probation and sentenced him to serve an indeterminate term not to exceed three years in the Colorado State Reformatory as punishment for the crime for which he had pleaded guilty. In response to a motion filed in November 1974 by Hogue's attorney asking that, in view of favorable reports received from correction officers at the facility where Hogue was confined, Hogue's sentence be modified, the Colorado court signed an order on December 23, 1974, placing Hogue on probation subject to conditions of supervision. In April 1975 a probation officer of the Colorado court filed a complaint that Hogue had violated conditions of his probation. At that time two additional actions apparently were pending against Hogue in the Colorado court, Case Nos. 7304 and 7487. Hogue was represented in the probation revocation proceedings by an attorney different from the one who had represented him when he entered

his plea of guilty and was sentenced. At the time of the hearing on the request for revocation of probation, Case Nos. 7638 and 7487 against Hogue in the same Colorado court apparently had been consolidated with Case No. 6785. By order signed December 8, 1985, the Colorado court dismissed Case Nos. 7638 and 7487 on the motion of the prosecutor and noted that Hogue had pleaded guilty to violation of his conditions of probation. The order directed that Hogue's sentence of an indeterminate term not to exceed three years at the Colorado State Reformatory on the charge of rape be reimposed and that he be given credit for 91 days for time spent in the reformatory and 125 days for time spent in the Boulder County jail awaiting disposition of other cases filed against him and pending disposition of the complaint that he had violated the conditions of his probation. In February 1976 Hogue's new attorney filed a motion for relief from his sentence of imprisonment, asking again that Hogue be placed on probation. By order signed March 1 1976 the Colorado court granted Hogue's motion, suspended the balance of his sentence of imprisonment, and placed him on probation for a period of 10 months, fixing conditions of supervision. In September 1976 a probation officer of the Colorado court filed a complaint alleging that Hogue had violated the conditions of his new probation, but in January, 1977 the probation officer moved to dismiss the complaint, which was dismissed by order signed by the Colorado court on January 6, 1977. This same order terminated Hogue's supervision because his period of probation had expired.

whether Hogue had been convicted in Colorado in September 1974 for the offense of rape and about the amount of time he served in Colorado for that offense, S.F. Vol. 15 at 3072–75, Hogue's responses that he "plead [sic] guilty to a fourth class felony of rape" and as to the sentence he received and the time he served, *id.*, and an answer by Hogue, on redirect examination, that the victim of the offense was his ex-wife, *id.* at 3112. The only objection made to the questions of the prosecutor was that the question about the conviction was "an improper form of impeachment, as that conviction, if any, is not final." *Id.* at 3072–73.

The state trial court gave the jury the following instruction before it started its deliberations at the guilty/innocence stage of Hogue's trial:

> You are further instructed that certain evidence was admitted in evidence before you in regard to the Defendant's having been charged and convicted of an offense other than the one which he is now on trial. Even if you belief such evidence beyond a reasonable doubt, such evidence cannot be considered by you against the Defendant as any evidence of his guilt in this case. Said evidence was admitted before you for the purpose of aiding you, if it does aid you, in passing upon the weight you will give his testimony, and you will not consider the same for any other purpose.

Tr. at 67. The only mentions made of the Colorado conviction by counsel in their final summations at the guilt/innocence phase were the following:

a. In opening, the prosecutor reminded the jury of the judge's instruction that the purpose for which the Colorado conviction was admitted was to aid them in judging Hogue's credibility as a witness. S.F. Vol. 15 at 3142.

b. Hogue's counsel Coffey, in a somewhat sarcastic manner, again reminded the jury of the judge's instruction, and he indicated that the fact that Hogue had a rape conviction had something to do with why Hogue was accused of the offense in ques-

tion and why the investigating authorities did not conduct further investigation in connection with Renick. *Id.* at 3171–72.

c. The prosecutor made a brief response to Coffey's comments relative to the effect of Hogue's conviction, *id.* at 3219, and, in closing, reminded the jury that in judging relative believability of Renick and Hogue the jury could consider that Hogue was a "convicted rapist," *id.* at 3214.

At the commencement of the punishment phase of the trial, the prosecutor made known to the court and counsel for Hogue that the prosecutor proposed to offer Colorado records marked Exhibit SX–52 as proof of Hogue's plea of guilty to the Colorado rape charge and his conviction and sentence on the basis of that plea. S.F. Vol. 16 at 3232–33. Hogue personally stated on the record that he had no objection to the offer of the exhibit, *id.* at 3233, as did counsel for Hogue, *id.* at 3233–34. The Colorado records were "proved up" through the testimony of a witness who established that the fingerprints displayed in the Colorado records matched fingerprints the witness had taken of Hogue. *Id.* at 3251–3263. There was no objection to the witnesses' testimony. No objection was made to receipt of the records in evidence. *Id.* at 3258. The only other references made during the punishment phase of the trial to the Colorado conviction were as follows:

a. During cross-examination of a witness from out of state the prosecutor had called to testify on the issue of Hogue's reputation for being a peaceful and law-abiding citizen in the community, Hogue's counsel established that Shawna Hogue is Hogue's daughter, that Claudia Hogue is Hogue's ex-wife, and that the three of them appear in photographs marked as defendant's Exhibit 6, 7, and 8.

b. In framing a hypothetical question to an expert witness who testified for the prosecution on the issue of future dangerousness, the prosecutor included as an assumed fact that Hogue had previously been convicted of rape in another state. *Id.* at 3302. In answering the question, the witness made known that he had taken

into account that Hogue had "committed a felony act" and had engaged in "repeated activity" in reaching his conclusion that Hogue presented "very much of a continuing threat to society." *Id.* at 3304–05. On cross-examination by Hogue's attorney, the same witness indicated that he was influenced to give his testimony of future dangerousness on the part of Hogue by the history of Hogue having committed violent acts over the years. *Id.* at 3323–25.

c. In the course of cross-examining a witness called by Hogue on the issue of future dangerousness, the prosecutor included in his questioning reference to Hogue's "prior conviction for violence." *Id.* at 3356.

d. At the behest of Hogue's counsel, Hogue's mother identified Hogue, Claudia (his ex-wife), and Shawna (Claudia's child) in the photographs mentioned above. *Id.* at 3369–70. The photographs were received in evidence through the mother. *Id.* 3370–73. The mother established that the photographs were taken while Claudia and the child were visiting Hogue at the reformatory, after Hogue had pleaded guilty, that Claudia was the injured party who sent Hogue to the reformatory, and that the mother took Claudia to visit Hogue at the reformatory because Claudia had no other way to go. *Id.* at 3370–74.

e. During summation to the jury, the prosecutor said "[we] know what happened in Colorado," *id.* at 3391, and made the following statement:

> Special Issue Number Two, is there a probability—we do not have to prove beyond a reasonable doubt that he will, only a mere probability, and you have seen the growing danger to society with this man. He even told you that when he got to the penitentiary for rape, he only served ninety days. Somebody made a mistake, didn't they? And, Jayne Lynn Markham paid for it.

*Id.* at 3411.

On September 21, 1981, Hogue filed several items in the state trial court, one of which was a motion for new trial. The only ground

for relief related to the Colorado conviction was, consistent with the position Hogue took during the trial, *i.e.*, that the state trial court erred in allowing the prosecutor to impeach Hogue "with a non-final conviction during the Guilt and Innocence proof of the trial." [sic] Tr. at 108bb.

### 2. *The role Hogue's Colorado conviction played in his state court direct appeal:*

Multiple briefs were filed by, and on behalf of, Hogue in the Court of Criminal Appeals of Texas in connection with his direct appeal. On June 16, 1981, Danny Burns ("Burns"), an attorney who had been appointed by the state trial court to represent Hogue in his appeal, filed a brief on behalf of Hogue; on August 10, 1981, Will Gray ("Gray"), an attorney Hogue had asked the state trial court to substitute for Burns, filed a brief on behalf of Hogue; and, Hogue filed a *pro se* brief, on April 13, 1982. The brief Burns filed presented nine grounds of error, only one of which mentioned the Colorado conviction. Brief of Appellant (filed 6/16/81 in the state trial court) at 3, 5, 7, 9, 11, 16, 19, 23, and 27. The ground that dealt with the Colorado conviction was, consistent with the trial position of Hogue, that the error related to the Colorado proceedings was "IN ALLOWING THE STATE TO IMPEACH [HOGUE] WITH A NON–FINAL CONVICTION DURING THE INITIAL PROOF STAGE OF THE TRIAL." *Id.* at 27. The brief Gray filed for Hogue likewise presented nine grounds of error, but none of them pertained to the Colorado conviction. Appellant's Brief (filed 8/10/81 in state trial court) at 20–21, 30, 35, 37–38, 40–41. The brief Hogue filed *pro se* raised eight grounds of error, none of which mentioned the Colorado conviction. Appellant's Pro–Se Brief at ii–iii. He did, however, argue under a ground of error complaining of his trial attorney (Ground of Error No. 5) that his trial counsel failed to provide him effective assistance of counsel in reference to questioning related to extraneous offenses, *id.* at 14, and in failing "to introduce the Colorado statute to support [Hogue's] non-final conviction, which was not available to impeach [Hogue] with," *id.* at 14.

Hogue, acting *pro se*, filed a supplemental brief with the Court of Criminal Appeals of Texas on April 22, 1982, in which he raised a ninth ground of error, but it had nothing to do with the Colorado conviction. Appellant's Pro–Se Supplemental Brief at 3.

In its opinion affirming the sentence and conviction, the Court of Criminal Appeals of Texas considered and rejected Hogue's argument that the state trial court erred in allowing the prosecutor to impeach Hogue with a non-final conviction (having reference to the Colorado conviction) during the guilt/innocence phase of the trial. *Hogue v. State*, 711 S.W.2d at 15–16.

3. *The role Hogue's Colorado conviction has played in his post-conviction, petitions and applications:*

In the state court application for writ of habeas corpus that Hogue, through Alley, filed January 15, 1987, the only ground related to the Colorado conviction was the ground designated as XIV, which complained of the state trial court's conduct in failing to exclude, and in allowing the prosecutor to impeach Hogue with, "a non-final conviction during the guilt/innocence stage of the trial". 1st State Habeas Tr. at 12.

The application Hogue filed in state court March 20, 1987, did not complain of the use of the Colorado conviction during the trial.[23] 2nd State Habeas Tr. at 6–9. The grounds for relief in the application Alley filed for Hogue in this court on March 23, 1987, were basically the same as those urged in the second State Court Application. The supplement Hogue filed *pro se* on May 27, 1987, to the March 23, 1987, application referred to the Colorado conviction in two of the supplemental grounds (Nos. 39 and 40). In ground 39, Hogue: (1) noted that the prosecutor was allowed to impeach Hogue "with a prior rape conviction that [Hogue] plead [sic] guilty to in 1974, and received probation," Motion for Leave to Amend and Supplement Original Petition for Writ of habeas corpus at 14; (2)

complained that during cross-examination the prosecutor injected improper, and prejudicial, remarks characterizing Hogue as a rapist, and accusing Hogue of having raped Markum, when "there was no direct or circumstantial evidence before the jury, [sic] that supported the fact that any of the victims were rape [sic]," *id.;* and, (3) complained that his counsel's failure to object to the prejudicial remarks uttered by the prosecutor jeopardized the deliberative process of the jury and infringed on Hogue's rights to a fair trial by an impartial jury. Hogue mentioned in ground 40 that the prosecutor's remarks characterizing him as a rapist continued in the punishment stage without objection by his counsel.

The grounds of the application for writ of habeas corpus Hogue filed in state court on August 11, 1987, did not mention Hogue's Colorado conviction, nor was the Colorado conviction mentioned in the version of the application Burns filed on behalf of Hogue in state court on August 19, 1987. 3rd State Habeas Tr. at 5–6, 17–18.

None of the grounds of the application for writ of habeas corpus Hogue filed in the state court on January 22, 1988, mentioned the Colorado conviction. 4th State Habeas Tr. at 3–4 Similarly, none of the grounds of the petition for writ of habeas corpus Hogue filed in federal court on April 13, 1989, made any mention of the Colorado conviction. The claims Hogue contended in the item he filed in federal court on July 12, 1990, were constitutional claims that had not been investigated due to the *pro bono* status of his counsel did not mention the Colorado conviction.

The application Hogue filed in state court on March 22, 1991, which led to the abuse-of-the-writ holding of the Court of Criminal Appeals of Texas, did not mention the Colorado conviction in any of the grounds of error, but Hogue did argue under an ineffective-assistance-of-counsel ground that his trial attorneys did not adequately investigate criminal charges filed against him in Colora-

---

**23.** Hogue did include as one of his grounds a complaint that the prosecutor, during the penalty phase, violated his constitutional rights by arguing to the jury that Hogue had served only ninety days for rape. 2nd State Habeas Tr. at 9.

do, apparently having reference to criminal charges other than the one to which he had pleaded guilty. 5th State Habeas Tr. at 21–23. The affidavits accompanying the March 1991 petition do mention Hogue's plea of guilty to the offense for which he was convicted in Colorado, but make no suggestion that Hogue's plea of guilty was anything other than a knowing and voluntary one. *Id.* at 55, 58, 61. Instead, Hogue asserted that:

> I pleaded guilty to a fourth class felony of rape involving my ex-wife in September, 1974 and was sent to the Colorado State Reformatory, because I was concerned that if I put my ex-wife through a jury trial that it would affect her emotional state of mind, and the possibility of this affecting my daughter. (Shawna April Hogue).

*Id.* at 55. His assertions were supported by the affidavits of his mother and sister. *Id.* at 58, 61.

4. *The mentions to the jury at Hogue's trial of the Colorado conviction were not a significant factor in Hogue's conviction or sentence—if there was error, it was harmless:*

■ Presumably, in reaching its verdict of guilty the jury followed the state trial court's instructions that (a) the evidence of Hogue's Colorado conviction could not be considered by the jury against Hogue "as any evidence of his guilt in [the] case," (b) the evidence of the conviction "was admitted before [the jury] for the purpose of aiding [the jury], if it does aid [the jury], in passing upon the weight [the jury] will give [Hogue's] testimony," and (c) the jury "will not consider the same for any other purpose." Tr. at 67. *See United States v. Thomas,* 12 F.3d 1350, 1363 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994) (quoting *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993)). The prosecutor was careful during final summations to explain to the jury the limited purpose for which the jury was informed of the Colorado conviction. S.F. Vol. 15 at 3142. Hogue so proved his lack of credibility by the false testimony he gave during the guilt/innocence phase of his trial that the knowledge that he had been convicted in Colorado undoubtedly was not a significant factor in the jury's evaluation of the weight to give Hogue's testimony. The only suggestion anyone made during the first phase of the trial that Hogue's rape conviction should be considered on any issue other than Hogue's credibility was the suggestion Hogue's counsel made in his final summation that the fact that Hogue had a record of having been convicted before explains why the investigating authorities did not further investigate the possibility that Renick, not Hogue, committed the crime at issue in the trial. *Id.* at 3171–72.

While Hogue's Colorado conviction played a slightly more significant role in the punishment phase of his trial, it was so overshadowed by the testimony of witness Hightower concerning her encounters with Hogue that one cannot reach a reasonable conclusion that the jury would have found differently than it did if it had not known of the Colorado conviction. Particularly is that so when one recognizes that the potential effect of the Colorado conviction was highly diluted by the testimony that the victim was Hogue's ex-wife and that she was so unoffended by his conduct that after his conviction she solicited transportation to the reformatory from his mother to pay him social visits. When witness Grigson's testimony is considered as a whole, there is no doubt that his answers would have been the same even if no mention had been made of the Colorado conviction. Clearly, he would have had the same opinions based solely on the history of violence reflected by witness Hightower's encounters with Hogue and the heinous conduct of Hogue at the time of, and during the hours immediately before, the offense for which he now stands convicted.

The evidence of guilt presented at trial was so overwhelmingly in favor of guilt that it negates any possibility of actual prejudice resulting to Hogue from the mentions of Hogue's Colorado conviction at that stage of the trial; and, the evidence, independent of the Colorado conviction, in support of the findings the jury made at the punishment

phase of the trial was so forceful that the possibility of actual prejudice resulting at that phase of the trial from the mentions of the conviction is negated. The mentions of the Colorado conviction did not have a substantial or injurious effect in determining the jury's verdict at either phase of the trial.

Any error caused by the mention of Hogue's prior conviction was harmless under the record of his trial. Such an error would be but a defect, irregularity, or variance which did not affect substantial rights of Hogue or have any substantial influence on the outcome of his case. Fed.R.Crim.P. 52(a). *See* 28 U.S.C. § 2111. There is no reason to think that the error, if there was one, resulted in actual prejudice to Hogue. *See Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993).

The Supreme Court decision upon which Hogue places principal reliance, *Johnson v. Mississippi,* does not apply here because in *Johnson* the receipt in evidence of the vacated conviction was clearly prejudicial to the inmate. 486 U.S. 578, 585–86, 108 S.Ct. 1981, 1986–87, 100 L.Ed.2d 575 (1988).

5. *The grounds based on mentions at Hogue's trial of the Colorado conviction are barred by the state court's abuse-of-the-writ determination:*

Hogue concedes that the Colorado conviction grounds of the petition, grounds 16 and 17, are among those that were first raised after the state court ruled that Hogue had abused the writ of habeas corpus. Petition at 16–17, 106 n. 53. For the reasons previously stated, *supra* at 1514–1515 Hogue is now barred from asserting those grounds.

6. *Hogue's failure to object to evidence of the Colorado conviction for the reasons he now asserts creates another procedural bar:*

 Hogue, both personally and through his counsel, expressly told the state trial judge that Hogue had no objection to the receipt into evidence at the punishment phase of the trial of proof of Hogue's Colora-

do conviction. *Supra* at 1518. Therefore, Hogue is procedurally barred from complaining of receipt of that proof. *Loud v. Estelle,* 556 F.2d 1326, 1329–30 (5th Cir.1977). As the only objection to proof of the conviction made at the guilt/innocence phase of the trial was that Hogue should not be impeached on the basis of the Colorado conviction *because it was not final, supra* at 1517–1518, Hogue is barred at this time from complaining of receipt into evidence of proof of the Colorado conviction at the guilt/innocence phase of his trial for any other reason, *i.e.,* that the conviction was invalid because he did not have proper legal representation when he pleaded guilty to the offense. *See Nichols v. Estelle,* 556 F.2d 1330, 1331 (5th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978).

Texas law is clear that an inmate cannot complain of admission of evidence unless he makes a timely objection to its admission. *Hill v. State,* 633 S.W.2d 520, 524–25 (Tex. Crim.App.1981) (*en banc*). The courts of Texas have consistently applied such a rule; and, the practice of requiring a timely objection was clearly established in Texas at the time of Hogue's trial. *Id.* at 524 (listing citations of pre–1980 court decisions). This state procedural rule as it applies to proof of a prior conviction is strictly and regularly followed. *See, e.g., Ex parte Cashman,* 671 S.W.2d 510, 512 (Tex.Crim.App.1983) *on reh'g* (*en banc*); *Ex parte Ridley,* 658 S.W.2d 177 (Tex.Crim.App.1983) (*en banc*). The only exception to this general rule exists in the case of a prior conviction by a court lacking jurisdiction to convict. *See Ex parte White,* 659 S.W.2d 434, 435 (Tex.Crim.App. 1983) (*en banc*); *Duplechin v. State,* 652 S.W.2d 957, 958 (Tex.Crim.App.1983) (*en banc*).

In *Wainwright v. Sykes,* the Supreme Court held that, absent a showing of cause for the noncompliance and some showing of actual prejudice, the failure of a post-conviction habeas applicant to make timely objection under a state contemporaneous-objection rule to the admission of evidence bars federal habeas corpus relief as to the allegedly inadmissible evidence. 433 U.S. 72, 86–91, 97

S.Ct. 2497, 2506–2509, 53 L.Ed.2d 594 (1977). *Loud* and *Nichols, supra* at 1522, are opinions of the Fifth Circuit that were decided on the basis of the Texas contemporaneous-objection rule and in reliance on *Wainwright.* Hogue has made no plausible suggestion of a valid cause for his failure to timely object on the ground that his Colorado conviction was invalid, and, as noted above, he has not made a showing of actual prejudice.

 There is no doubt that the ground of relief urged by Hogue based on invalidity of his Colorado conviction would have been barred from consideration in the state court due to his procedural default if it had been presented there. Where, as here, the issue was not presented to the state court, but would clearly be barred from consideration due to procedural default if it had been so presented, this court should consider the issue barred. *Teague v. Lane,* 489 U.S. 288, 298–99, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989).

7. *The record does not support the assertion that the state knowingly presented a false picture of Hogue's Colorado conviction:*

 The record simply does not bear out the contention Hogue makes in his ground 16 that the prosecutor knowingly presented a false picture of Hogue's guilty plea to rape in Colorado. The basic facts are that Hogue pleaded guilty to the charge of rape in the State of Colorado and that his ex-wife was the victim. Those facts were clearly made known to the jury. The record reflects that the use the prosecutor made of the Colorado conviction was entirely appropriate. The state did not have an obligation to try to convince a jury that Hogue's Colorado conviction was without merit. Moreover, as the court has previously noted, no prejudice was suffered by Hogue from mentions made during his trial of his Colorado conviction.

### E.

*The State Presented Sufficient Evidence to Sustain a Verdict of Capital Murder*

The seventh ground of Hogue's petition reads as follows:

7. THE STATE FAILED TO PRESENT EVIDENCE SUFFICIENT TO SUSTAIN A VERDICT OF CAPITAL MURDER.

Petition at 79.

This same contention was rejected by the Court of Criminal Appeals of Texas. *Hogue v. State,* 711 S.W.2d at 12–13. Not only was there sufficient evidence for the jury to find Hogue guilty of capital murder, the evidence of his guilt was so overwhelming that any reasonable mind would conclude from the evidence that Hogue was guilty. *Supra* at 1500–1509.

### F.

*Hogue's Grounds Related to Evidentiary Matters are Unmeritorious*

Hogue complains of evidentiary rulings by his eighth, ninth, eleventh, and thirty-first grounds, which read as follows:

8. THE TRIAL COURT DENIED MR. HOGUE HIS RIGHT TO CONFRONTATION WHEN IT PERMITTED A POLICE OFFICER TO TESTIFY BY RECITING A LENGTHY, UNRECORDED STATEMENT MADE BY STEVE RENICK AT THE SCENE OF THE OFFENSE.

Petition at 82.

9. GRISLY COLOR PHOTOGRAPHS WERE ADMITTED INTO EVIDENCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL SOLELY TO INFLAME THE MINDS OF THE JURORS.

*Id.* at 84.

11. THE ADMISSION OF EVIDENCE OF UNADJUDICATED EXTRANEOUS OFFENSES AT THE PENALTY PHASE OF MR. HOGUE'S TRIAL DEPRIVED HIM OF PROTECTIONS GUARANTEED BY THE CONSTITUTION.

*Id.* at 87.

31. THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENSE COUNSEL A BRIEF CONTINU-

ANCE IN ORDER TO MEET THE STATE'S EVIDENCE OF UNADJUDICATED EXTRANEOUS OFFENSES.

*Id.* at 160.

■ Ground 8 has reference to the testimony by witness Shetler, *supra* at 1507, concerning statements made by witness Renick to Shetler, while in an excited state, at the scene of the fire. In response to a ground urged in Hogue's first state court application complaining of Shetler's testimony, 1st State Habeas Tr. at 12 (¶ XIII), the state court found, *inter alia,* that "the trial judge had sufficient evidence before him to conclude that the victim's statements [to Shetler] were within the hearsay exception for excited utterances," *id.* at 107. Hogue raised the same ground in the application he filed in state court on January 22, 1988. 4th State Habeas Tr. at 6, 8 (ground "i"). The state court resolved that ground against Hogue by the finding, *inter alia,* that Renick's statements to Shetler were "excited utterances." *Id.* at 74. Also, the state court found that, in any event, Hogue had no basis for complaint because if there was any error in the admission of Shetler's testimony it was rendered harmless by the ability of Hogue's counsel to cross-examine Renick when he took the stand. *Id.*

The record makes clear that the state court was quite correct in concluding that Renick's statements to Shetler, about which Shetler testified, were excited utterances. The state trial court did not err in allowing Shetler to relate those utterances to the jury. Moreover, counsel for Hogue had ample opportunity to test the accuracy of those utterances by their cross-examination of Renick when he was called to the stand. No error, much less constitutional error, exists in reference to the testimony Shetler gave concerning Renick's statements to him.

■ Similarly, the admission into evidence of the photographs, even if erroneous, does not present a matter of constitutional magnitude. The fact is that the state trial judge acted with propriety in allowing the photographs to be admitted before the jury.[24]

■ There was no error, and certainly no constitutional error, related to the admission in evidence of the testimony of witness Hightower concerning her encounters with Hogue. *Supra,* at 1509–1510 (summarizing witness Hightower's testimony). The point under discussion was urged by Hogue, and rejected by the Court of Criminal Appeals of Texas, on Hogue's direct appeal. *Hogue v. State,* 711 S.W.2d at 29.[25] The testimony given by Hightower concerning her encounters with Hogue was relevant to the punishment phase of the trial; and, the state trial court acted with propriety in allowing the evidence to be received. The state had a right to rely on the unadjudicated offenses committed by Hogue against Hightower. *See Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987). Hightower's testimony was not received until the punishment phase. Thus, it did not affect the outcome as to the guilt/innocence phase; and, it had direct bearing on one of the questions to be answered by the jury at the punishment phase.

■ Hogue's contention that he did not have prior notice of the state's intent to use the testimony of Ms. Hightower is ill-founded. Indeed, the record reflects that before Ms. Hightower took the stand Hogue's attorneys filed a motion *in limine* in connection with "a witness that [the prosecutors] have informed us that they are going to present to the jury on acts of violence by the name of

---

**24.** The state contends in its answer to the petition, Answer at 53 n. 25, that Hogue's complaint relative to admission of the photographs would, in any event, be barred by the state court's abuse-of-the-writ ruling. The court does not reach that issue.

**25.** Hogue complained of witness Hightower's testimony by a ground of his first state court application. 1st State Habeas Tr. at 15. It was rejected by the findings and conclusions the state court adopted on February 24, 1987. *Id.* at 106, 109.

Karen Hightower." S.F. Vol. 16 at 3264. Hogue's counsel were given a preview of Hightower's testimony by the ruling by the state trial judge that her testimony would be developed outside the presence of the jury before she was put on the stand in the jury's presence. *Id.* at 3238–50. Before trial, the state had listed Hightower as a person who was to testify as a witness at the trial. *Id.* at 3248.

■ There is no merit to the claims of Hogue that the admission of Hightower's testimony violated his Fourteenth Amendment rights and that more particularized instructions should have been given to the jury concerning the consideration it should give to the testimony. As to the latter, there is no reason to believe that the jury did not under the charge it received give proper effect to Hightower's testimony as well as to the impeachment testimony developed by Hogue's counsel.

Nor was there any error in not allowing Hogue's counsel more time to prepare for cross-examination of Hightower. As noted above, they had ample notice that Hightower would be used by the state as a witness. Furthermore, the record shows that Hogue's counsel were prepared for cross-examination of Hightower, S.F. Vol. 16 at 3290–92, and that they were able to bring in a witness for the purpose of attempting to impeach her. *Id.* at 3335–36.

All the grounds discussed under this heading are without merit.

### G.

*Hogue's Ground 29 Relative to Pretrial Motions is Without Merit*

■ Ground 29 of the petition reads as follows:

29. PRETRIAL MOTIONS HAVE NOT BEEN INCLUDED IN THE RECORD DESPITE TIMELY ORAL AND WRITTEN DESIGNATION.

Petition at 153. This is one of the grounds subject to the abuse-of-the-writ ruling. In any event, it is without merit. Hogue com-

plains by his ground 29 that requested items have not been included in the record. He specifically mentions "at least an entire volume of testimony" received at his first trial. *Id.* at 155. However, Hogue makes no suggestion of any harm resulting from any omission from the record. Even if items that should have been included in the record were omitted, Hogue has not stated factual basis for a finding that he suffered any actual prejudice or that the omission resulted in a fundamental miscarriage of justice.

### H.

*There was No Constitutional Error in the Denial of Hogue's Motion for a Change of Venue*

■ Hogue's thirtieth ground reads as follows:

30. THE TRIAL COURT ERRED IN DENYING MR. HOGUE'S MOTION FOR A CHANGE OF VENUE.

Petition at 155. This is another ground included in those barred by Hogue's abuse-of-the-writ. It is unmeritorious in any event.

■ Hogue was entitled to a fair trial before an impartial tribunal. *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). But, the Constitution does not require that jurors be completely unaware of the facts and issues to be tried. *Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977); *Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2035–2036. A constitutional violation is not shown by the mere circumstance that in the community there is extensive knowledge about the crime or the accused. *Patton v. Yount,* 467 U.S. 1025, 1032–34, 104 S.Ct. 2885, 2889–90, 81 L.Ed.2d 847 (1984); *Dobbert,* 432 U.S. at 303, 97 S.Ct. at 2303.

There is nothing in the record that would lead to the conclusion that there was so great a prejudice against Hogue that he could not obtain a fair and impartial trial in Tarrant County; nor, does the record contain anything to suggest that Hogue in fact did not

receive a fair trial before an impartial tribunal. Hogue has not pointed to anything in the record that would support a conclusion that the state trial court committed error in overruling Hogue's motion for change of venue after having heard the evidence related to that subject.

## I.

*Hogue's Grounds Related to a Mental Health Expert are Without Merit*

 Grounds 24 and 25 of the petition are worded as follows:

24. THE TRIAL COURT ERRED IN DENYING MR. HOGUE THE SERVICES OF A MENTAL HEALTH EXPERT TO ASSIST IN PREPARING AND PRESENTING HIS DEFENSE.

Petition at 134.

25. THE TRIAL COURT ERRED IN GRANTING MORE MONEY TO THE PROSECUTION TO USE IN EMPLOYING A PSYCHIATRIC EXPERT THAN IT GRANTED TO THE DEFENSE FOR THE SAME PURPOSE.

*Id.* at 139. These grounds are among those barred by the abuse-of-the-writ ruling of the state court. They are without merit in any event.

The thrust of Hogue's contention under grounds 24 and 25 is that the state trial court should have arranged for a mental health expert "who actively could have assisted in preparing and presenting the defense [for Hogue]." Petition at 137. This contention goes far beyond any request Hogue made prior to trial, which was that Hogue be given a "conditional" psychiatric evaluation. Transcript of 2/29/80 hearing on pretrial motions at 15, 17. Hogue's attorney's request for an evaluation was on condition that, in addition to granting the request, the state trial court rule in advance that the state not be allowed to use anything gathered from the evaluation as evidence at any phase of the trial. *Id.* The prosecutor did not oppose Hogue's request for an evaluation, but opposed his request for an advance ruling restricting use of the information that might be gained the

evaluation, contending that such a ruling would be premature. *Id.* Hogue's attorney said that there would be no psychiatric evaluation of Hogue unless the court granted it on Hogue's conditions. *Id.* at 17. The state court's denial was of Hogue's motion "[a]s requested." *Id.*

Hogue cannot complain now that he was denied a psychiatric evaluation—he insisted on more than that and made known that he would not accept only that. Counsel for Hogue should have been content to request the evaluation and then to seek a ruling from the trial court at an appropriate time concerning any restrictions that might be placed on use of results of the evaluation. Presumably, if the facts existing at that time indicated that a restriction should be placed on use of the results, the state trial judge would have made the proper ruling. Moreover, Hogue was granted the services of a psychologist, Dr. Wendell Dickerson, formerly employed with the Texas Department of Corrections, who testified for Hogue at the punishment phase of the trial. S.F. Vol. 16 at 3337–67. Apparently the decision that Dickerson would not evaluate Hogue was Hogue's. There is nothing in the record to suggest that the state court kept Dickerson from making such an evaluation.

The record does not reflect that any action taken by the state trial court prevented Hogue from having any trial assistance that, if provided, would have substantially altered the outcome of his case. There was no error in the state trial court's rulings relative to health care assistance for Hogue and his counsel; but, if there was any error, it did not infringe on Hogue's constitutional rights. Hogue has not stated any facts that would support a conclusion that he suffered any actual prejudice as a result of the absence of a mental health expert as part of his defense team.

## J.

*Hogue Does Not Demonstrate any Brady v. Maryland Violations*

Hogue's fifteenth ground reads as follows:

15. DESPITE SPECIFIC REQUESTS, THE STATE FAILED TO PRODUCE EXCULPATORY EVIDENCE RELATED BOTH TO GUILT/INNOCENCE AND PUNISHMENT.

Petition at 108. This is another ground barred by the state court's abuse-of-the-writ ruling. It is without merit independent of that fact.

 For Hogue successfully to complain on the basis of *Brady v. Maryland*, he must establish that (a) evidence was suppressed by the prosecution, (b) such evidence was favorable to Hogue, and (c) such evidence was material either to guilt or punishment. 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). *See also Brogdon v. Blackburn*, 790 F.2d 1164, 1167 (5th Cir. 1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987). Evidence that has been suppressed is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The prosecutor has no duty to disclose evidence about which the defendant knows or should know. *May v. Collins*, 904 F.2d 228, 231 (5th Cir.1990), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991); *United States v. Ramirez*, 810 F.2d 1338, 1343 (5th Cir.), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987).

Hogue asserts that three items of evidence were withheld from him by the prosecutor. He first says that the state knew, but did not reveal to Hogue's counsel, that the three pairs of jeans contained in Markham's suitcase, which was found in the trunk of Hogue's vehicle, belonged to Renick and not Hogue. Petition at 109–10. Next, Hogue contends that the state withheld mitigating evidence of Hogue's adjustment to prison life in Colorado. *Id.* at 110–11. Finally, he asserts that the prosecutor possessed knowledge of his "mental state" in the form of a

comment from Hogue's brother the day after the fire that Hogue was "crazy" and in the form of a statement made by witness Hightower to police that Hogue had told her that things "just came over him." *Id.*

 As to the matter of the jeans, there is no basis in the record for a reasonable contention that a disclosure to Hogue's counsel that the jeans belonged to Renick (if they did) would have caused a different trial outcome. If the jeans did not belong to Hogue, that fact was already known to him. Indeed, Hogue's counsel felt comfortable enough with the evidence in the trial record on the subject of ownership of the jeans to make the point in closing argument that the jeans could not have been worn by Hogue because they were not his size. S.F. Vol. 15 at 3197. Hogue's counsel had full opportunity to question Renick and Hogue on the subject of ownership of the jeans if counsel were not satisfied with what they could perceive would be the status of the record on that subject.

 Second, Hogue is not in a position to complain of a suppression of evidence of his good prison behavior in Colorado because his attorney had records on that subject, and, in fact, put records bearing on that subject in evidence, out of the presence of the jury. S.F. Vol. 14, Ex. "A" (inserted between pages 2897–2909). Hogue does not state any facts that would permit a finding that the prosecutor had more knowledge of Hogue's prison behavior than Hogue and his counsel possessed.[26] Hogue already knew the quality of his prison behavior. Furthermore, Hogue has not demonstrated in any way that anything known by the prosecutor on that subject that was not known to him would have made a difference in the outcome of Hogue's trial if there had been a disclosure.

 Finally, Hogue's contentions relative to the withholding of information about his mental condition are equally unmeritorious. He does not allege any fact that would support a conclusion that the things said by

---

**26.** So far as the record reflects, Hogue's counsel had timely knowledge of the information mentioned by Crocker and Owen in their June 1992

affidavits. Petitioner's Reply to Respondent's Answer and Motion for Summary Judgment, Exs. "2" and "3."

witness Hightower were withheld from him. Nor, does he allege any facts to indicate that the prosecutor withheld disclosure of any knowledge the prosecutor had of anything Hogue's brother said about him the day after the fire or that he did not have access to his brother's opinion about his mental state. And, again, even if the information was withheld, there is no allegation by Hogue of facts permitting a conclusion that there is a reasonable probability that the result of the proceeding would have been different had there been a disclosure.

## K.

### *None of Hogue's Grounds Related to Jury Selection Are Meritorious*

The grounds of the petition related to jury selection are as follows:

5. THE TRIAL COURT GAVE "UNOFFICIAL STRIKES" TO THE STATE DURING VOIR DIRE.

*Id.* at 68.

12. THE TRIAL COURT WRONGLY EXCUSED VENIREPERSON MARY PORTER FOR CAUSE.

*Id.* at 101.

20. THE TRIAL COURT ERRED IN REFUSING TO PERMIT DEFENSE COUNSEL TO QUESTION VENIREPERSON JOHN WESLEY STRICKLAND CONCERNING HIS ABILITY TO CONSIDER THE MINIMUM PUNISHMENT FOR NON–CAPITAL MURDER.

*Id.* at 122.

21. THE TRIAL COURT ERRED IN REFUSING TO EXCUSE VENIREPERSON JOHN WESLEY STRICKLAND FOR CAUSE.

*Id.* at 125.

22. BECAUSE JUROR PAMELA SUE HOLLEY WAS CONVICTED OF FELONY BURGLARY PRIOR TO JURY SERVICE AND WAS THEREFORE ABSOLUTELY DISQUALIFIED FROM SERVING ON THE JURY, MR. HOGUE'S JUDGMENT IS VOID AND HIS CONVICTION SHOULD BE REVERSED.

*Id.* at 128.

23. THE TRIAL COURT ERRED IN LIMITING DEFENSE COUNSEL'S VOIR DIRE.

*Id.* at 131.

Grounds 20, 21, 22, and 23 are included in those barred by state court's abuse-of-the-writ ruling. None of the grounds have merit.

■ Hogue received what the Constitution guaranteed him if his jury was composed of persons who could conscientiously and properly carry out their sworn duty to apply the law to the trial evidence. *See Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988) (quoting *Lockhart v. McCree,* 476 U.S. 162, 184, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986)); *see also Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984). The court finds that Hogue received what the Constitution guaranteed him.

■ His contention that the state trial court gave unofficial strikes to the state during *voir dire* is premised on the assumption that the state trial judge was dishonest. The remarks of the judge on which Hogue bases his complaint were poorly expressed comments by which the judge was attempting to convey the thought that he was trying to be fair in the jury selection process. Petition at 69; S.F. Vol. 9 at 1928–29. After counsel for the state apparently pointed out to the judge the possible misuse that might be made of the comments, the judge made clear on the record that he meant to say that he had given the defense side the benefit of the doubt a time or two when he did not think there was legal challenge for cause. *Id.* He specifically said that he had not done that in favor of the state at any time. *Id.* The court has no reason to question the honesty of the now deceased state trial judge. Therefore, the court accepts at face value the explanation he gave concerning his poorly worded comments. Moreover, there is nothing to indicate that anything relative to the granting of peremptory challenges caused

Hogue to be denied a jury of the kind guaranteed him by the Constitution.

The assertion that constitutional error resulted from the state trial court's excusal of venireperson Porter also is meritless. This claim was presented, and rejected, on direct appeal. *Hogue v. State,* 711 S.W.2d at 17–18. The Court of Criminal Appeals of Texas reached the correct result by finding that the juror was properly disqualified.

The court turns now to the complaint that the state trial court committed constitutional error relative to permitted questioning of venireperson Strickland by Hogue's counsel. The record clearly reflects that fair *voir dire,* including questions by the court, was conducted of Strickland. There was uncertainty as to the propriety of the initial question posed to Strickland by defense counsel on the subject of the possibility of considering a minimum sentence. S.F. Vol. 2 at 286–87. The judge adequately explained why he ruled as he did. *Id.* at 311–12. When counsel for Hogue restated the question in a proper way, Strickland was allowed to answer the question. *Id.* at 287.

■■■ Nor does Hogue's ground complaining of the state trial judge's refusal to excuse Strickland for cause have merit. The trial court's failure to sustain a challenge for cause is violative of a defendant's Sixth Amendment rights only if a juror who was properly excludable for cause sat on the jury and the defendant properly preserved his right to challenge the trial court's failure to remove the juror for cause. *Ross,* 487 U.S. at 85–86, 108 S.Ct. at 2276–2277. The important inquiry is whether the persons who were selected to sit on the jury were impartial, not whether a venireperson for whom a challenge for cause was denied should have been excused. *Id.* at 86, 108 S.Ct. at 2277. There has been no *prima facie* showing by Hogue that a juror properly excludable for cause sat on the jury, much less that Hogue properly preserved his right to challenge the trial court's failure to remove such a juror for cause. Furthermore, the court finds that there is no basis for saying that the state trial judge abused, or exceeded, his discre-

tion in finding that Strickland was not excusable for cause.

■■■ Hogue is incorrect in his assertion that the fact that juror Holley was a convicted felon, and therefore disqualified from service on the jury, causes Hogue's conviction and sentence to be void. Holley's disqualification to serve as a juror results from a Texas procedural rule. *See* Tex.Code Crim.Proc. §§ 35.16(a)(2) and 35.19 (Vernon 1989). Because "[f]ederal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct errors of constitutional dimensions," *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982), the failure of a state court to comply with a state procedural rule presents a question of state law only. For that reason, this court ordinarily does not review questions of state criminal procedure. *See Moreno v. Estelle,* 717 F.2d 171, 179 (5th Cir.1983), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984). A question of constitutional dimensions arises only where a violation of state procedure amounts to a violation of due process that renders the trial as a whole fundamentally unfair. *Sawyer v. Butler,* 848 F.2d 582, 594–95 (5th Cir.1988), *aff'd* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). There has been no *prima facie* showing that Holley's service on the jury rendered Hogue's trial as a whole fundamentally unfair. As the Supreme Court recognized in *Kohl v. Lehlback,* a juror disqualification "defect is not fundamental as affecting the substantial rights of the accused and the verdict is not void for want of power to render it." 160 U.S. 293, 302, 16 S.Ct. 304, 307, 40 L.Ed. 432 (1895).

■■■ Hogue's ground that his constitutional rights were denied because of limitations placed on his trial counsel's *voir dire* is a strong contender for the most frivolous of the large number of frivolous grounds Hogue has asserted in his petition. The trial court's refusal to permit the "eye for an eye and a tooth for a tooth" inquiry could not possibly have had any effect whatsoever on the quality of the jury Hogue had at his trial. If Hogue's trial counsel thought the subject to

**1530**

be the least bit important, they certainly were skillful enough to seek the same information through a reworded question.

### L.

*Nothing Prevented Hogue's Counsel from Developing and Presenting Mitigation Evidence*

Hogue's fourth and thirty-second grounds for relief read as follows:

 4. THE STATE PREVENTED COUNSEL FROM INVESTIGATING, DEVELOPING, AND PRESENTING RELEVANT MITIGATING EVIDENCE IN SUPPORT OF A LIFE SENTENCE FOR MR. HOGUE.

Petition at 52.

 32. THE TEXAS CAPITAL SENTENCING STATUTE IMPROPERLY PRECLUDED THE JURY FROM CONSIDERING EVIDENCE IN MITIGATION OF MR. HOGUE'S SENTENCE.

*Id.* at 162. Ground 32 is barred by the abuse-of-the-writ ruling. Neither ground has merit.

■■ Hogue's explanation of his fourth ground is that he is contending that the Texas statutory death sentence scheme, as it existed at the time of Hogue's trial, "violated his right to effective assistance of counsel by interfering with counsel's ability to make independent decisions about how to conduct the defense." Petition at 57. He maintains such a result follows from the kind of charge and special issues the state trial court used at the punishment phase of the trial. *See* Tr. 72–75. Hogue virtually concedes that the opinions in *May v. Collins,* 904 F.2d 228 (5th Cir.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991), and *May v. Collins,* 948 F.2d 162 (5th Cir.1991), *cert. denied,* 502 U.S. 1046, 112 S.Ct. 907, 116 L.Ed.2d 808 (1992), require a ruling against Hogue on his fourth ground. Petitioner's Reply to Respondent's Answer and Motion for Summary Judgment at 26. The court has concluded that, indeed, by its rulings in the *May v. Collins* opinions the Fifth Circuit has foreclosed successful assertion of Ho-

gue's fourth ground. The theoretical arguments Hogue makes in support of the fourth ground avail him nothing in this case because he has not pointed to any potential mitigation evidence that was available but withheld which would have had "a major mitigating thrust" substantially beyond the scope of the two special issues. *See Demouchette v. Collins,* 972 F.2d 651, 653 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 27, 120 L.Ed.2d 952 (1992); *Bridge v. Collins,* 963 F.2d 767, 770 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993).

Nothing in the record suggests that Texas law prevented Hogue's counsel from investigating, developing, and presenting any relevant mitigating evidence in support of a life sentence for Hogue. Moreover, at this point in time, there simply is no way anyone can tell what evidence the state trial court might have allowed as mitigating evidence if it had been offered. In the application for writ of habeas corpus Hogue filed in state court on January 22, 1988, Hogue asserted a ground that is essentially the same as the fourth ground of the petition. 4th State Habeas Tr. at 4. In the course of rejecting that ground, the state court found that:

 20. There is nothing before this Court to indicate that Applicant was in any way prevented from introducing relevant mitigating evidence at the punishment stage of his trial.

*Id.* at 75. Nothing in the record before this court would cause a different finding to be made.

Furthermore, one can only speculate as to what the state trial court might have been persuaded to include in the charge as an added instruction or issue on the subject of mitigation if Hogue had offered additional evidence or if an added instruction or issue had been requested. Hogue did not object to failure of the trial court to submit to the jury an additional instruction, nor did he request an additional instruction or issue on any subject. S.F. Vol. 16, at 3385–86. The only objection Hogue made to the charge was granted by the state trial court's deletion

from the charge of language pertaining to the possibility of parole. *Id.* at 3386. Texas law did not prohibit the giving by the trial court of additional instructions on the subject of mitigation if one had been requested.

Hogue's arguments under his thirty-second ground amount to a restatement of those under the fourth ground, this time viewed from the standpoint of the jury's reaction to the state trial court's charge at the punishment phase instead of, as presented by the fourth ground, the standpoint of the reaction of Hogue's counsel. Suffice to say, all mitigating evidence the jury received was relevant to one of the issues the jury was to answer.

The net effect of Hogue's contentions under grounds 4 and 32 is that the Supreme Court's holdings in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), invalidated the Texas statutory death sentence scheme. In *Graham v. Collins* the Fifth Circuit explained why such a contention lacks merit. 950 F.2d 1009, 1026 (5th Cir. 1992) (*en banc*), *aff'd,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993).

### M.

#### *There was No Constitutional Error in the Court's Charges to the Jury*

The tenth, twenty-seventh, and thirty-third grounds of the petition are as follows:

10. THE JURY CHARGE AT THE GUILT PHASE RELIEVED THE PROSECUTION OF ITS OBLIGATION TO PROVE EVERY ELEMENT OF THE CRIME BEYOND A REASONABLE DOUBT.

Petition at 85.

27. THE LACK OF DEFINITIONS FOR THE KEY TERMS IN THE SPECIAL ISSUES RESULTS IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY.

*Id.* at 142.

33. THE TRIAL COURT ERRED IN FAILING TO DEFINE "REASON-

ABLE DOUBT" IN ITS INSTRUCTIONS TO THE JURY AT BOTH PHASES OF TRIAL.

*Id.* at 178.

The twenty-seventh and thirty-third grounds are barred by the abuse-of-the-writ ruling. None of these grounds have merit.

The contentions made by Hogue in ground 10 are procedurally barred. The state appellate court ruled against Hogue on that ground because he failed to make timely objection to the court's charge to the jury. *See* Tex.Code Crim.Proc. articles 36.14, 36.15, 36.19; *Hogue v. State,* 711 S.W.2d at 13 (saying that "no error is preserved" as to this ground because Hogue "voiced no objection to this aspect of the court's charge"). Also, the contentions are substantively without merit. The state court reached the following conclusions in response to a claim Hogue made in ground 23 of his first state court application for writ of habeas corpus:

In paragraph XXIII Applicant claims the jury instructions were fundamentally erroneous for not requiring the jury to find that the accused had a specific intent to commit murder. The version of Penal Code § 19.03 under which Applicant was convicted does not require a "specific intent," but it does require that the murder be "intentional." The jury was instructed to that effect both in the abstract and charging portions of the instructions. The jury charge was entirely correct on this point.

1st State Habeas Tr. at 107–08. The court agrees. The wording of the charge to the jury at the guilt/innocence phase of the trial made clear that for Hogue to be found guilty the jury would have to find beyond a reasonable doubt that Hogue intentionally caused Markham's death. Tr. at 61–63.

Under ground 27 Hogue argues that the state trial court should have given the jury for consideration at the punishment phase instructions relative to the meanings of the terms "deliberately," "probability," "criminal acts of violence," "continuing threat," and "society," as those terms were

used in the questions the jury was to answer at that phase. Petition at 142. He urges that those terms are "facially vague and reasonable jurors are likely to interpret and apply them differently." *Id.* at 142–43. Hogue reasons that, as a consequence, "the Texas special issues do not satisfy the constitutional requirement of guiding and channeling the jury's decision in imposing the death penalty." Petitioner's Reply to Respondent's Answer and Motion for Summary Judgment at 49–50.

The court disagrees with Hogue's assertion that the terms about which he complains are vague. In *Thompson v. Lynaugh,* the Fifth Circuit considered a similar challenge to the failure to define the term "deliberately." 821 F.2d 1054, 1060 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987). The Court determined that such a challenge must be considered a due process claim for denial of a fundamentally fair trial, then went on to hold that the common meaning of "deliberately" is sufficiently clear to all the jury to decide the punishment issues. *Id. See also Johnson v. Collins,* 964 F.2d 1527, 1531 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 4, 120 L.Ed.2d 933 (1992). Likewise, the term "probability" is not so vague that jurors of common intelligence would have to guess at its meaning. *Granviel v. State,* 552 S.W.2d 107, 117 (Tex.Crim.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). Similarly, the other terms to which Hogue refers in his discussion under ground 27 are definitive enough, without further instructions, that jurors of common intelligence would understand the meanings of the terms without having to guess. In the context of a capital case, the words of which Hogue complains could not reasonably be taken to mean significantly different things to the individual jurors. *See Milton v. Procunier,* 744 F.2d 1091, 1096 (5th Cir. 1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

▮ The complaint made by Hogue in ground 33 suffers a further procedural bar because of Hogue's failure to timely request an instruction of the kind he says should have been given relative to the term "reasonable doubt." *See* Tex.Code Crim.Proc. articles 36.14, 36.15, 36.16 and 13.19. Even if that were not so, Hogue's claim is without merit. As Hogue mentions, the decision of the Court of Criminal Appeals of Texas requiring a definition of the term "reasonable doubt" was handed down in November 1991. *Geesa v. State,* 820 S.W.2d 154, 161 n. 10 (Tex.Crim.App.1991). Before the *Geesa* ruling took effect, jurors in Texas courts were instructed on the concept of reasonable doubt in non-definitional terms. *Id.* (citing *Carr v. State,* 600 S.W.2d 816 (Tex.Crim.App.1980)). When he did not include a definition of "reasonable doubt" in his charge to the jury, the judge presiding over Hogue's trial correctly followed Texas law as it then existed. *Geesa* specifically held that the requirement of a "reasonable doubt" definition was to be applicable only "to the instant case and to all cases tried hereafter." 820 S.W.2d at 165. In *American Trucking Ass'ns, Inc. v. Smith,* the Supreme Court held that, when questions of state law are at issue, "state courts generally have the authority to determine the retroactivity of their own decisions." 496 U.S. 167, 177, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990). Thus, Hogue cannot gain comfort from *Geesa.*

The court is satisfied that reasonable jurors would have understood from the language of the state trial court's guilt/innocence charge as a whole the burden borne by the state. That is all the law required. *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

The court does not reach the other arguments made by respondent in answer to Hogue's grounds 27 and 33.

## N.

### *The Conduct of the Prosecutors Did Not Violate Hogue's Constitutional Rights*

Hogue complains of conduct of the prosecutor by his grounds 13, 18, 19, 26, and 35, which read as follows:

13. THE PROSECUTORS' CLOSING ARGUMENT AT THE GUILT PHASE URGED THE JURY TO CONVICT MR. HOGUE BASED ON FEARS OF WHAT HE MIGHT DO IN THE FUTURE.

Petition at 104.

18. BY INJECTING HIS PERSONAL OPINIONS DURING CLOSING ARGUMENT, THE PROSECUTOR IRREPARABLY TAINTED THE JURY'S DELIBERATIONS ON MR. HOGUE'S GUILT.

*Id.* at 118.

19. THE PROSECUTOR'S ARGUMENT CONCERNING THE CHARACTER OF THE DECEASED WAS IMPERMISSIBLY INFLAMMATORY AND PREJUDICIAL.

*Id.* at 120.

26. THE STATE PRESENTED PERJURED TESTIMONY FROM "DR. DEATH," JAMES P. GRIGSON.

*Id.* at 140.

35. THE PROSECUTORS' MISCONDUCT THROUGHOUT MR. HOGUE'S TRIAL RENDERED HIS CONVICTION AND SENTENCE FUNDAMENTALLY UNFAIR.

Amended Petition for Writ of Habeas Corpus at 6 (where the thirty-fifth ground is designated with "XX"). The eighteenth, nineteenth, twenty-sixth, and thirty-fifth grounds are barred by the abuse-of-the-writ ruling. None of the grounds have merit.

▮ This court "may not sit as a 'super state Supreme Court' to review errors under state law governing the limits of professional argument," *Whittington v. Estelle,* 704 F.2d 1418, 1422 (5th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983); rather, this court's review of the propriety of arguments made by the prosecution is a narrow one of due process, *Byrne v. Butler,* 845 F.2d 501, 507 (5th Cir.), *cert. denied,* 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988). Due process does not require reversal based on improper jury argument unless the argument "so infect[s] the

trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Bell v. Lynaugh,* 828 F.2d 1085, 1095 (5th Cir.), *cert. denied,* 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987). In order to gain federal habeas corpus relief based on the argument of the prosecutor, Hogue "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." *Jones v. Butler,* 864 F.2d 348, 356 (5th Cir.1988), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989). Moreover, the comments of the prosecutor "are not considered in isolation, but are evaluated in the context of the entire trial as a whole including the prosecutor's entire closing argument." *Kirkpatrick v. Blackburn,* 777 F.2d 272, 281 (5th Cir.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

▮ The court cannot conclude that any of the prosecutor's arguments raise constitutional issues that entitle Hogue to relief. First, the arguments of which Hogue complains were appropriate under the circumstances. Second, there certainly is no indication from the record that the jury would have rendered a verdict for Hogue but for the remarks of the prosecutor. When the entire record of the trial is considered, there can be no doubt that the arguments of the prosecutor about which Hogue complains were not a factor in causing the jury to find as it did at either phase of the trial. The remarks of the prosecutor did not so infect Hogue's trial with unfairness as to make the resulting verdicts a denial of due process.

▮ Turning now to Hogue's ground 26 pertaining to witness Grigson, the court notes that for that ground to bear fruit Hogue would be required to demonstrate that Grigson gave perjured testimony, the perjured testimony was material, and the prosecution used the testimony knowing that it was false. *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d

104 (1972); *Schlang v. Heard,* 691 F.2d 796, 799 (5th Cir.1982), *cert. denied,* 461 U.S. 951, 103 S.Ct. 2419, 77 L.Ed.2d 1310 (1983); *United States v. Brown,* 634 F.2d 819, 827 (5th Cir.1981). First, the court finds that the testimony of which Hogue complains was not material to the outcome of the punishment phase of Hogue's trial, bearing in mind the entire record of the trial. Next, there is no suggestion that the prosecutor knowingly sponsored false testimony. In *United States v. Sutherland,* the Fifth Circuit said:

> [D]ue process is not implicated by the prosecutor's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured;

656 F.2d 1181, 1203 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982) (quoting *United States v. Brown,* 634 F.2d at 827).

The complaint Hogue makes by his ground 35 is, in large part, another attempt by Hogue to establish a ground for relief based on the conduct of which Hogue complains in grounds 13, 18, and 19. When all of Hogue's complaints relative to the conduct of the prosecutor are considered, the same results follow. The conduct of the prosecutor did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 180, 106 S.Ct. at 2471. None of the prosecutorial conduct about which Hogue complains, whether considered separately or cumulatively, caused Hogue to be denied due process. The evidence supporting the findings made by the jury was substantial enough that those same findings undoubtedly would have been made whether or not the prosecutor had done the things about which Hogue complains.

### O.

*There Was No Constitutional Error Related to Juror Smith's Conduct*

Hogue's first, second, fourteenth, and thirty-fourth grounds read as follows:

> 1. THE TRIAL COURT VIOLATED MR. HOGUE'S RIGHTS BY CONDUCTING AN EX PARTE EXAMINATION OF JUROR SMITH, BY DENYING DEFENSE COUNSEL THE OPPORTUNITY TO REEXAMINE JUROR SMITH AND BY REFUSING TO PERMIT COUNSEL TO EXERCISE A PEREMPTORY CHALLENGE AGAINST JUROR SMITH.

Petition at 25.

> 2. COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE BY NOT RAISING A KNOWN CLAIM OF JUROR MISCONDUCT IN A MOTION FOR NEW TRIAL.

*Id.* at 28.

> 14. ATTORNEY BURNS DENIED MR. HOGUE EFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO FILE A MOTION FOR NEW TRIAL ONCE HE LEARNED THAT, PRIOR TO TRIAL, ONE OF THE JURORS WAS BIASED AGAINST HIS CLIENT.

*Id.* at 106.

> 34. BECAUSE JUROR SMITH WAS BIASED AND PREJUDICED AGAINST MR. HOGUE PRIOR TO HEARING THE EVIDENCE IN THE CASE, MR. HOGUE WAS DENIED A TRIAL BY A FAIR AND IMPARTIAL JURY.

Amended Petition for Writ of Habeas Corpus at 2. Ground 14 is included in those barred by the abuse-of-the-writ ruling. All these grounds are without merit.

Hogue raised basically the same grounds he urges by his current grounds 1, 2, 14, and 34 in the state court application for writ of habeas corpus he filed January 22, 1988.[27] The state trial court had an evidentiary hearing, in two sessions, on the merits of the facts on which those grounds are predicated, following which the state court determined all disputed issues of fact against Hogue. None of the "unless" circumstances listed as (1)

---

**27.** However, since the abuse-of-the-writ ruling, the focus of the ineffective-assistance-of-counsel contention relative to the failure to assert jury bias in the motion for new trial has shifted from only trial counsel to appellate counsel, Burns, as well as trial counsel. Insofar as it is directed against Burns, it is barred by the abuse-of-the-writ ruling.

through (8) in § 2254(d) exist as to the state court's determinations. Thus, the determinations of the state court are presumed to be correct. 28 U.S.C. § 2254(d). The procedural events that led to those determinations are described below.

In his January 22, 1988, application Hogue asserted the following grounds:

(a) The Applicant was denied due process of law and a trial by a fair and impartial jury, in violation of the Fourteenth Amendment to the Constitution of the United States, when the trial court conducted an ex parte examination of juror Donnie [28] Ray Smith prior to commencement of the trial.

(b) The Applicant was denied due process of law and a trial by a fair and impartial jury, in violation of the Fourteenth Amendment to the Constitution of the United States, when the trial court denied the Applicant an opportunity to examine juror Donnie Ray Smith after it was made known that juror Smith had, prior to the commencement of the trial, expressed to the trial court a concern about serving on the jury in this case.

(c) The Applicant was denied due process of law and a trial by a fair and impartial jury, in violation of the Fourteenth Amendment to the Constitution of the United States, when the trial court refused to permit the Applicant to exercise a peremptory challenge to excuse juror Donnie Ray Smith, prior to the commencement of the trial, after it was made known to the Applicant that juror Smith had expressed to the trial court a concern about serving on the jury in this case.

(d) The Applicant was denied due process of law and a trial by a fair and impartial jury, in violation of the Fourteenth Amendment to the Constitution of the United States, because juror Donnie Ray Smith was prejudiced and biased against the Applicant.

(e) The Applicant was denied due process of law and a trial by a fair and impartial jury, in violation of the Fourteenth Amendment to the Constitution of the United States, because juror Donnie Ray Smith, who was prejudiced and biased against the Applicant prior to the commencement of the trial, failed to advise either the trial court or counsel for the Applicant during the voir dire examination of juror Smith of his prejudice and bias and testified falsely during voir dire examination that he was not prejudiced or biased against the Applicant.

. . . .

(h) The Applicant was deprived of the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States, because his trial counsel failed to:

. . . .

(2) investigate reports that juror Donnie Ray Smith was prejudiced and biased prior to the commencement of the Applicant's trial; and

(3) file a motion for new trial based on juror Smith's prejudice and bias, as previously stated.

4th State Habeas Tr. 3–5.

Starting on March 24, 1988, and continuing on August 8, 1988, the state trial court held an evidentiary hearing on the grounds of the January 22, 1988, application. Statement of Facts, Hearing on Writ of Habeas Corpus, (Post–Conviction Writ), March 24, 1988 ("3/24/88 hearing"); Statement of Facts Post–Conviction Writ Hearing (Continued) August 8, 1988 ("8/8/88 hearing"). At the commencement of the hearing Hogue, through his counsel, explained the issues as to which he proposed to offer evidence:

MR. MASON: I think that probably the two primary areas that we would like to go into today is that Mr. Hogue has alleged that his trial attorney, now Judge Frank Coffey, was ineffective because a juror, Donny Ray Smith, was selected and em-

---

**28.** This juror's first name appears in the record of the proceeding at which he gave testimony as "Donny." Statement of Facts, Hearing on Writ of Habeas Corpus (Post–Conviction Writ), 3/24/88 hearing, at 9.

paneled as a juror after it became known to Mr. Coffey that Donny Ray Smith had expressed a prejudice toward the defendant personally, and accused people, in general, prior to the time he was actually chosen on a jury.

Secondly, during the hearing, Mr. Smith made a representation to the Court that he did not want to serve on the jury, and the Judge at that time, not Your Honor, conducted an ex parte hearing with the jury [sic] and excluded Mr. Coffey from the hearing and determined after the conclusion of that ex parte hearing that the juror was qualified to sit in the case.

Thirdly, that Donny Ray Smith had a conversation with Harley Belew and Dennis Enos at some point during the trial, we know not what at this point, but at some point, either just prior to the trial starting and after he was empaneled as a juror, or just after the trial started, saying that he was in effect going to "hang the defendant," and this was before deliberations had begun, expressing his prejudice towards people accused of crimes again.

THE COURT: You want to put on testimony in those areas?

MR. MASON: Yes.

3/24/88 hearing at 5–6. Testimony was received from juror Donny Ray Smith, Hogue's mother, Mary Lucille Ebel, Frank Coffey, one of Hogue's trial attorneys, Dennis Wayne Enos, Danny Burns, one of Hogue's appellate attorneys, and, Harley David Belew, through means of an oral deposition taken by telephone. 3/24/88 hearing; 8/8/88 hearing; Tr. of deposition by telephone of Harley David Belew (Ex. SX1 to record of 8/8/88 hearing). Also, the state trial court received in evidence the affidavit Hogue's mother had given

on August 9, 1980, concerning her claim that she heard juror Smith make certain remarks in the hallway outside the courtroom during the course of jury selection.[29] 8/8/88 hearing at 49.

Based on the record the state court had at the conclusion of the hearing, the state court made the following determinations in reference to the matters presented by grounds 1, 2, 14, and 34 of Hogue's petition in the instant action:

1. When Donnie Ray Smith learned that he had lost his job, he had already been selected as a juror for the second trial of this case, but the entire panel had not been selected. At that time Smith went to the trial judge and spoke to him in chambers.[30] The Applicant was not present for this conversation, nor were the attorneys for Applicant or the State. The trial judge at that time was the Honorable Randall Riley. It is undisputed that Judge Riley conducted an ex parte examination of Smith in his chambers and that he did so without notice to the attorneys for either side. However, as is set out more fully in this Court's Conclusions of Law, Judge Riley was correct in ruling that Smith was still fit for service as a juror, and the ex parte nature of the examination did not harm or prejudice the Applicant in any manner.

2. Smith told the trial judge he believed that he was fired from his job because he was going to be serving on the jury in Applicant's case. He asked the trial judge if he could be dismissed from the jury in order to look for a new job. The judge replied that he could not dismiss Smith on that basis. He then asked if Smith could be an impartial juror despite

29. The August 9, 1980, affidavit of Hogue's mother was an attachment to a motion for new trial Hogue filed *pro se* on September 8, 1980. Tr. 94–97.

30. Apropos to the communication between the state trial judge and juror Smith, the Supreme Court commented in *Rushen v. Spain* that:

There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak

to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.
464 U.S. 114, 118–19, 104 S.Ct. 453, 455–56, 78 L.Ed.2d 267 (1983).

the loss of his job. Smith replied that he believed he could, and that he did not believe his job loss would affect him in his deliberations; although he preferred to get out of service on the jury, he could nonetheless serve and do so impartially. Smith had only been working at his job a short time.

3. The trial judge then went into the courtroom and told Applicant and the attorneys for both sides about his conversation with Smith. Applicant's attorneys asked to be allowed to question Smith further in light of this new development, but the trial court refused this request. The court also denied counsel's request that Smith be excused from service on the jury.

4. Smith's service as a juror was not raised as an issue in his direct appeal. Nor did any of Applicant's appellate attorneys base a ground of error on the judge's conversation with Smith or on the judge's subsequent refusal of trial counsel's various requests regarding Smith's fitness as a juror or on Smith's alleged prejudice against Applicant.

5. On his direct appeal, Applicant was represented by several competent counsel, including Danny Burns of Tarrant County and Will Gray of Harris county.

6. Applicant's trial counsel—Frank Coffey and Robert Roe—were also extremely competent criminal defense attorneys, and they conducted Applicant's defense in accord with their own high standards and the high standards of their profession.

7. Donnie Ray Smith was not prejudiced against Applicant as a result of Smith's loss of his job, nor did this fact in any way affect his decision on guilt or punishment.

8. Smith did not have any preconceived prejudice against Applicant.

9. Smith did not have advance knowledge of the facts of this case or Applicant's connection with it, except for the normal generalized knowledge, such as the fact that it was a murder case. He had no preconceived determination to impose the maximum punishment on the Applicant.

10. At no time, either prior to or after his individual voir dire, did Applicant tell a fellow venireperson that he had read about Applicant's case in the newspaper; nor did he ever tell such a person that there was no doubt about Applicant's guilt, or that he would "hang" Applicant if he were put on the jury. Applicant's mother did not overhear such a conversation, and she did not at any time tell Applicant's trial counsel that she overheard such a conversation.

11. After Applicant's trial was over and Smith had finished his service as a juror, Smith had a conversation with Dennis Enos at the home of Harley Belew. Smith and Belew were friends of long standing, and Smith had known Enos well since junior high school or earlier. Smith knew Enos could easily be maneuvered into getting angry if Smith got into an argument with him and took a strong position he knew Enos disagreed with. Smith often did this with Enos and other acquaintances as a form of teasing; it amused Smith to successfully "pull the leg" of people in this fashion. During their post-trial conversation at Belew's residence, Smith successfully employed this tactic against Enos when he suggested to Enos that he was prejudiced against Applicant prior to serving as a juror.

12. Smith does not deny that such a conversation with Enos took place, but he is unable to recall the conversation. Smith does deny that any such conversation took place before or during trial, and this Court finds that Smith is telling the truth in this respect: the conversation with Enos took place *after* the conclusion of Applicant's 1980 trial in this case.

13. Smith was in fact not prejudiced against Applicant prior to trial. He intimated to Enos that he was, but did so only to get a "rise" out of Enos during his post-trial conversation with Enos.

14. Within a week after Smith's conversation with Enos, Belew and Enos went to see one of Applicant's trial attorneys, the

Honorable Frank Coffey, in order to tell him about the conversation. Coffey was no longer representing Applicant. However, he passed made sure the information Enos and Belew brought him got to one of the attorneys who *was* representing Applicant at that time, either Robert Roe or Ward Casey or Danny Burns.

15. No issue was raised on Applicant's direct appeal as to Smith's possible prejudice as a juror. No contention was made that he was affected in his attitude by his job loss, nor did counsel raise an issue of the trial court's refusal to allow further examination of Smith. Counsel likewise made no contention on appeal that the trial court erred by refusing to allow Applicant to strike Smith, either peremptorily or for cause. Nor did counsel contend on appeal that Smith's prejudice against Applicant was revealed through his post-trial conversation with Dennis Enos. The failure of counsel to raise these issues on appeal was due to Applicant's firing of Casey and Burns, and to the fact that the issues were correctly perceived by counsel to be without merit.

16. Even if it could be concluded that Frank Coffey was still representing Applicant when he was approached by Harley Belew and Dennis Enos, it could not be concluded that Coffey deprived Applicant of the effective assistance of counsel, because the Court finds that different actions by Coffey would not have affected the outcome of the case in any way: Had Coffey taken prompt action on Belew's and Enos's revelations, the facts would have appeared the same then as the Court now finds them to be, namely, that Donnie Ray Smith did not in any way prejudge Applicant's case, and that Smith's contrary assertions to Enos occurred after the trial and were the product of a misguided attempt at jocularity.

4th State Habeas Tr. at 70–74 (record references omitted).

1. Applicant was not deprived of due process or a trial by a fair and impartial jury by Donnie Ray Smith's service as a juror, nor did the actions of the trial court, counsel, or Smith deprive Applicant of due process or a fair and impartial jury.

2. The ex parte nature of the trial judge's examination of Donnie Ray Smith did not deprive Applicant of due process or trial by a fair and impartial jury. The judge was correct in finding that Smith was not prejudiced against either party to the lawsuit. Applicant was not harmed or prejudiced in any way by the ex parte nature of Judge Riley's examination of Smith.

. . . .

6. If any of the issues concerning Donnie Smith's jury service had been raised at a motion for new trial or on appeal, they would have been found to be without merit. These issues were: Smith's alleged general prejudice against Applicant; Smith's alleged prejudice against Applicant as a result of Smith's losing his job; the trial court's refusal to allow a second voir dire of Smith after he lost his job; the trial court's refusal to allow the defense a retroactive challenge against Smith; and trial counsel's alleged failure to pursue the issue of Smith's alleged prejudice.

*Id.* 75–76. Based on the foregoing determinations, as well as findings and conclusions related to other grounds, the state trial court, by order signed November 2, 1988, recommended that all relief requested by Hogue's January 22, 1988, application be denied. By *per curiam* order signed January 6, 1989, the Court of Criminal Appeals of Texas, after having "carefully reviewed the record with respect to the allegations brought by [Hogue]," found that "the trial court's findings and conclusions are fully supported by the record"; and, based on that determination, the court denied all relief sought by Hogue's application. 1/6/89 *per curiam* opinion of Texas Court of Criminal Appeals in No. 16,907–04. These determinations by the state court are of the kinds that are entitled to a presumption of correctness. *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983); *Smith v. Phillips,* 455 U.S. at 218, 102 S.Ct. at 946.

Although the actions taken by the state court decide the outcome of Hogue's grounds 1, 2, 14, and 34, this court has independently reviewed the record as it pertains to those grounds, including the affidavits of Bobby Hackett and Charles J. Press (which are included as Exhibits 25 and 26 in Volume 1 of the three-volume appendix to the petition); and, the court has concluded that, if findings were appropriate by this court on the fact issues pertinent to the grounds under discussion, this court would make the same findings the state court made.[31]

### P.

### The General Ineffective–Assistance–of–Counsel Ground has No Merit

The ground by which Hogue generally claims that he was not provided effective assistance at trial reads as follows:

3. TRIAL COUNSEL FAILED TO PROVIDE MR. HOGUE EFFECTIVE ASSISTANCE THROUGHOUT THE COURSE OF HIS TRIAL.

*Id.* at 35.

Respondent maintains that some of the complaints made by Hogue under this scattergun ineffective-assistance-of-counsel ground are barred by the abuse-of-the-writ ruling. Answer at 23, 27–28, 30, 34, 39. The court is inclined to agree with respondent, but does not need to resolve that issue. The ground is without merit in any event.

Hogue's assertions that his "trial attorneys failed to defend him" from beginning to end, that "[a]t every turn, Mr. Coffey's and Mr. Roe's performance fell outside the wide range of professional and competent representation," and that "counsel so failed to subject the prosecution's case to meaningful testing that the trial constituted a complete breakdown of the adversarial process," Petition at 35, are unreasoned to the point of absurdity. The court has studied carefully the record of the trial of this action; and, the

court is satisfied that attorneys Coffey and Roe gave Hogue excellent trial representation. If Hogue's present counsel had an acceptable level of professionalism, they would not have so besmirched the professional reputations of Hogue's trial counsel.[32]

For Hogue to prevail on an ineffective assistance of counsel claim, he must show (1) that his counsel's performance "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and (2) that counsel's deficient performance prejudiced his defense, *i.e.,* that counsels' errors were "so serious as to deprive [Hogue] of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. at 2064, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697, 104 S.Ct. at 2064, 2069.

"Judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, 104 S.Ct. at 2065; and, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2065. The "reasonableness of counsel's challenged conduct on the facts of the particular case" must be "viewed as of the time of counsel's conduct." *Id.* When the complaint is of failure

---

**31.** Hogue's ground 14 refers to attorney Burns rather than attorney Coffey, but the outcome is the same no matter which attorney is accused of ineffectiveness in relation to juror Smith.

**32.** These attacks by Hogue's present counsel of Hogue's former attorneys are but examples of the lack of professionalism displayed throughout the petition and its related documents.

to investigate, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.*

1. *Hogue's complaints relative to voir dire examination:*

■ In paragraphs 57–60 of the petition, Hogue second-guesses decisions his trial counsel made during *voir dire* examination. Petition at 35–37. But, Hogue presents nothing that, if accepted by the court, would overcome the strong presumption that trial counsel's *voir dire* conduct falls within the wide range of reasonable professional assistance. Each of Hogue's complaints of counsel's conduct during *voir dire* is directed to a matter that presumably was the result of sound trial strategy, viewed as of the time of the conduct. Nor does Hogue present anything that would support a conclusion that counsel's conduct relative to *voir dire* caused Hogue not to receive a fair trial or otherwise prejudiced him.

2. *Hogue's complaint that trial counsel did not further investigate Hogue's Colorado conviction:*

■ In paragraphs 61, 67, 68, and 69 of the petition, Hogue complains that trial counsel did not adequately investigate, or present more information pertaining to, his Colorado conviction. *Id.* at 37–38, 41–44. The earlier discussion, *supra,* at 1516–1523, provides an answer to those complaints. As the court noted there, the mentions at Hogue's trial of the Colorado conviction were not a significant factor in his conviction or sentence. *Supra* at 1521–1522. Even if trial counsel should have made further inquiry, their failure to do so did not constitute an error of performance so serious as to deprive Hogue of a fair trial or to otherwise prejudice Hogue. The fact is that there is not any basis for a claim that, under the circumstances, counsel should have

conducted further inquiry. The conviction occurred five years before to Hogue's trial. It was based on a plea by Hogue that he was guilty of the offense charged. He had completed service of his punishment for the conviction. There is a limit on the number of "rabbit trails" counsel can pursue. A decision, if one was made, not to investigate whether Hogue really was guilty of the offense to which he pleaded guilty five years earlier, and to limit the attack on use of the conviction to the ground of lack of finality, was reasonable under the circumstances. The court finds that such a decision would be within the wide range of reasonable professional assistance. So was the failure of trial counsel to present more information pertaining to the Colorado conviction. The jury was informed that the victim was Hogue's ex-wife and that she was not particularly upset with him for his conduct. Trial counsel could reasonably conclude that Hogue could be harmed if they dwelled further on the subject of the Colorado conviction.

3. *The complaints that trial counsel failed to object often enough:*

■ The complaints Hogue makes in paragraphs 62, 64, and 86 of the petition that his trial attorneys did not object often enough during cross-examination of Hogue and closing arguments are basically the same complaints that were the subject of an evidentiary hearing held February 24, 1987, on Hogue's first application for writ of habeas corpus. Hogue's then habeas counsel, Alley, questioned Coffey at some length concerning his reasons for not making objections, Statement of Facts of 2/24/87 Hearing, Vol. II of V volumes, at 3–33; and, the state court had the benefit of Coffey's affidavit related to the same subject, Statement of Facts of 2/24/87 Hearing, Vol. III of V volumes, at 3–4. An answer to Hogue's complaints was provided when Coffey explained:

> Mr. Roe and I also kept in mind that the evidence against our client was strong and the facts very distasteful, so that part of our strategy in the trial was to avoid antagonizing the jury by being unnecessarily argumentative. . . .

.... Again, the facts we had to deal with in this case did not leave us much to work with, and we did not feel then, and I do not feel now, that technical objections to relatively minor matters during cross-examination of the defendant or during closing argument would have enabled us to change the outcome of the trial, either in the trial court or on appeal.

*Id.* Hogue points to nothing that would overcome the presumption that the tactical decision of his trial counsel relative to minimal use of objections falls within the wide range of reasonable professional assistance. The court finds that counsel's conduct was within that range. In addition, Hogue does not make a *prima facie* case that the failure of trial counsel to make more objections deprived Hogue of a fair trial or otherwise prejudiced him. The court finds that it did not.

4. *Hogue's complaints relative to cross-examination of witnesses Crawford and Renick:*

■ In paragraph 63 of the petition, Hogue maintains that his trial counsel should have conducted different, or more, cross-examination of witnesses Crawford and Renick. Petition at 40. The court finds that trial counsel's cross-examination of those witnesses was competent and as effective as reasonably could be expected. If the cross-examination had been more extensive or penetrating, trial counsel would have run the risk that the jury would perceive the questioning as an unfair badgering of the victim-witnesses, thus causing a reaction against Hogue. Cross-examination is an art that requires instant judgment decisions; and, no two attorneys would do it alike. A habeas attorney, twelve years after the fact, is not in a position to dictate what should have been done by way of cross-examination during the heat of trial. Hogue has not made a *prima facie* showing that the cross-examination conducted by his trial counsel was outside the range of reasonable professional assistance, nor has he made a *prima facie* case that different, or more, cross-examination would have enhanced his prospects of trial success.

5. *Hogue's complaint that trial counsel did not make proper use of potential evidence pertaining to his conduct while in the reformatory and in jail:*

■ In paragraph 66 of the petition, Hogue complains that his trial counsel ignored available mitigating evidence showing that he successfully adjusted to living in the Colorado State Reformatory and that counsel failed to obtain records from the Tarrant County Jail showing that Hogue lacked a disciplinary record while there following his arrest in January 1979. *Id.* at 41. Obviously, trial counsel would have been entitled to consider the possibility that development before the jury of the details of periods of Hogue's incarcerations could do Hogue more harm than good; and, a decision, for that reason, not to pursue such a matter before the jury would fall well within the range of reasonable professional assistance. Proof of lack of a disciplinary record in the Tarrant County Jail or of favorable conduct while at a reformatory in Colorado would not be calculated to have caused the outcome of Hogue's trial to be different than it was. Hogue has not pleaded any facts that would support a finding that he did not receive a fair trial, or that he was prejudiced, by the failure of trial counsel to develop such matters.

6. *Hogue's complaint that trial counsel failed to rebut Hightower's testimony:*

■ In paragraph 71 of the petition, Hogue complains that his trial counsel failed to rebut witness Hightower's testimony concerning her encounters with Hogue. *Id.* at 44. As previously discussed, *supra* at 1524–1525, trial counsel had advance notice of the prosecutor's intent to use Hightower's testimony and they were prepared to cross-examine and attempt to impeach her. Hogue does not present anything that indicates that trial counsel's conduct in reference to Hightower was outside the wide range of reasonable professional assistance. Nor does Hogue proffer anything to suggest that he was denied a fair trial or otherwise prejudiced by reason of any conduct of counsel in relation to Hightower. Trial counsel could have reasonably concluded, and presumably did con-

clude, that the prudent approach to witness Hightower would be to offer evidence that her reputation was bad and to make known to the jury that the criminal action against Hogue arising from his encounters with her was not successfully prosecuted, and then leave the matter at that. Nothing Hogue claims would, if believed, lead to a finding that he did not receive a fair trial, or was otherwise prejudiced, because of the handling by his trial counsel of matters pertaining to Hightower.

7. · *The complaint that trial counsel should have developed additional mitigating evidence:*

■ By paragraphs 72–79 of the petition, Hogue complains of his trial counsel's failure to investigate and present mitigating evidence relating to Hogue's family background and his psychological makeup. Considering the record made at the trial of Hogue's case, the court cannot conclude that the failure of trial counsel to develop any of the things to which Hogue refers constituted a failure of counsel to provide reasonable professional assistance. Any number of factors could have entered into counsel's decision not to pursue further the matters mentioned by Hogue in his petition. Presumably counsel's decisions were based on sound trial strategy. Hogue has not suggested any facts that would lead to a contrary conclusion. Furthermore, even if the mitigation information suggested by Hogue been put in front of the jury, there is not a reasonable probability that the result of the punishment phase of the trial would have been different. Having seen Hogue testify at the guilt/innocence phase of the trial and having observed the glibness with which he expressed himself and his ability to match wits with the cross-examiner, the jury probably would not have been persuaded that Hogue had a mental impairment or deficiency of a kind that would weigh against imposition of the death penalty. Moreover, the gruesomeness of the capital murder Hogue committed was such that the play for jury sympathy Hogue says in his petition his trial counsel should have made probably would have fallen on deaf juror

ears. Neither prong of the *Strickland* test has been met by Hogue in reference to the complaints he makes relative to trial counsel's failure to develop and present mitigation evidence.

8. *Hogue's contentions that trial counsel misperformed in failing to seek post-trial relief relative to juror Smith and juror Holley:*

In paragraph 87 of the petition, Hogue complains that his trial counsel were ineffective because of their failure to investigate and present as grounds for new trial the alleged misconduct of juror Smith and the alleged disqualification of jury Holley. As to juror Smith, there was no misconduct. *Supra* at 1534–1539. Moreover, Hogue has not proffered anything that would overcome the presumption that trial counsel's conduct in reference to juror Smith or juror Holley did not fall within the wide range of reasonable professional assistance. Nor is the court convinced that there is a reasonable probability that, but for counsel's conduct in reference to jurors Smith and Holley, the result of Hogue's proceeding would have been different.

\* \* \* \* \* \*

Whether considered separately or cumulatively, the ineffective-assistance-of-counsel claims of Hogue are without merit. He has proffered nothing to overcome the presumption that counsel's conduct falls within the wide range of reasonable professional assistance or that would lead to a finding that there is a reasonable probability that, but for the conduct of counsel of which he complains, the result of the proceeding would have been different. There is no need for an evidentiary hearing on this subject because Hogue has failed to allege facts that, if proved, would entitle him to relief and for the further reason that the state court record suffices for disposition of his contentions. *Clark v. Collins,* 19 F.3d 959, 964 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 432, 130 L.Ed.2d 344 (1994).

Q.

*Hogue's Conviction and Sentence Were Not Imposed Arbitrarily or Capriciously*

▮ Hogue's sixth ground for relief reads as follows:

6. MR. HOGUE'S CONVICTION AND DEATH SENTENCE WERE IMPOSED ARBITRARILY AND CAPRICIOUSLY.

Petition at 71.

An issue basically the same as the one Hogue raises by his ground 6 was presented by Hogue to the Court of Criminal Appeals of Texas on his direct appeal. *Hogue v. State,* 711 S.W.2d at 12–13. The explanation given by the Texas appellate court for rejecting Hogue's contention, which is adopted by this court, is set forth below:

At the time of the commission of this offense, V.T.C.A., Penal Code, Section 19.03(a)(2), provided that capital murder occurred when an individual intentionally committed murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson.

V.T.C.A., Penal Code, Section 28.02(a) defined arson as follows:

"(a) A person commits an offense if he starts a fire or causes an explosion:

"(1) without the effective consent of the owner and with intent to destroy or damage the owner's building or habitation; or

"(2) with intent to destroy or damage any building or habitation to collect insurance for the damage or destruction."

Obviously, no evidence was introduced at trial regarding Section 28.02(a)(2), so for the purpose of our discussion, we consider the offense as defined in Section 28.02(a)(1).

In their commentary to Section 28.02, supra, Searcy and Patterson write the following:

"Arson is graded a second-degree felony unless any person, presumably including the actor, suffers bodily injury less than death as a result of the arson. In that event, it is a first-degree felony. In effect, arson and an assaultive offense are consolidated and the punishment enhanced. If death occurs, arson is only a second degree felony. Causing the death, however, ordinarily would constitute murder under Section 19.02(a)(3) and be punishable as a first-degree felony. *If the actor intended to murder, the offense would be a capital felony under Section 19.03(a)(3)* [sic]."[ ] (emphasis added).

From reading the above, it is clear that capital murder—arson occurs only when the appropriate mens rea is satisfied: an intent to murder *and* under the fact [sic] of this case an intent to destroy or damage the owner's building without the effective consent of the owner. Appellant maintains that since there was only one fire, there was only one act and thus only one criminal intent. Appellant is wrong on both counts.

Clearly there were two intents—an intent to kill his victims and an intent to destroy or damage the property. The first intent is evidenced by the numerous times appellant told his victims that he was going to kill them. Indeed, the actions of appellant in binding Renick and Markham, and incapitating [sic] Crawford by stabbing her with a butcher knife and then setting the house on fire clearly show an intent to kill. The act of setting the house on fire is proof of his intent to commit arson, that is, destroying or damaging the owner's building.

As far as appellant's argument concerning one act—once again appellant is in error. The evidence showed not only that appellant set the house on fire, but also that he tightly bound the hands and feet of the deceased and then bound them together. Had appellant not restrained the deceased in such a manner, she would have been able to escape. The evidence clearly shows two acts.

*Id.* at 13.

The explanation given by the Texas court answers, and shows to be unmeritorious, the

thrust of Hogue's contention under ground 6 that "[u]pholding Mr. Hogue's conviction and death sentence would allow the death penalty to be sought and imposed based solely on a singular unaggravated act of murder." Petition at 71. The court does not find necessary to discuss the more detailed arguments made by Hogue under his ground 6. As he has in his arguments under most of his grounds, Hogue has sought to make a rather simple matter appear complex.

## R.

### *There Was No Violation of the Ex Post Facto Clause*

██ Hogue's twenty-eighth ground for relief reads as follows:

> 28. MR. HOGUE'S CONVICTION AND DEATH SENTENCE VIOLATE THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION.

Petition at 150. This is one of the grounds barred by the abuse-of-the-writ ruling. Even if that were not so, it is without merit.

The argument Hogue makes in support of his ground 28 is related to the argument he made in support of his ground 6, which is discussed directly above in subsection Q. This time, Hogue's slant is that he "had no notice at the time of the offense that his conduct could be punished by death." *Id.*

By legislation adopted in 1973, the Texas Legislature included arson as an underlying felony that, when combined with murder, would constitute a capital offense. *See* Acts 1973, 63rd Leg. at 1123, ch. 426, art. 2 § 1, eff. Jan. 1, 1974. The indictment against Hogue corresponded with the 1973 legislative enactment. Thus, when he committed the arson/murder in January 1979, he had notice that his conduct was a capital offense.

## VII.

### *THE MOTION FOR SUMMARY JUDGMENT*

The document by which respondent answered the petition combines a motion for summary judgment with the answer. Rather than to resolve this action on the basis of the motion for summary judgment, the success of which depends on the conclusion that there is no genuine issue as to any material fact, the court has made a number of findings of fact on the basis of the record as a whole, including all the records of the state trial court and the state appellate court. Nevertheless, the court is inclined to think that the outcome would be the same if the court were to study the record with a view to deciding whether there is a material fact that is genuinely in dispute. The expression by the court of the finding of a fact does not imply that the fact is material, in a summary judgment sense, or genuinely in dispute. Many of the court's findings relate to facts that are only pertinent to alternative reasons why Hogue's grounds are without merit.

## VIII.

### *HOGUE'S REQUEST FOR DISCOVERY, AND HIS RELATED MOTION PURSUANT TO RULE 56(f) ARE DENIED*

The court is not persuaded that Hogue has shown good cause for an order authorizing him to invoke the processes of discovery in this action. *See* Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts. The record already existing in this action is sufficient to enable the court to make informed rulings on all grounds of the petition. Moreover, Hogue's request to invoke discovery is nothing other than an attempt to embark on a fishing expedition. "Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983). Therefore, Hogue's request for discovery and his related motion pursuant to Fed.R.Civ.P. 56(f) are being denied.

## IX.

### *ORDER*

The court ORDERS that Hogue's requests for a further evidentiary hearing, requests for discovery, and motion under Rule 56(f) be, and are hereby, denied.

For the reasons given above, the court has concluded that none of the grounds of the petition have merit, and that the petition should be denied. Therefore,

The court ORDERS that the petition for writ of habeas corpus of Jerry Lee Hogue be, and is hereby, denied and be, and is hereby, dismissed.

The court further ORDERS that the stay of execution granted by the order signed by the court in this action on May 22, 1992, be, and is hereby, lifted so that it is of no further force or effect.

## CORRECTIVE ORDER

After having considered the motion filed by petitioner, Jerry Lee Hogue, ("Hogue") on November 30, 1994, titled "Motion to Alter and Amend Judgment Pursuant to Rule 59, Federal Rules of Civil Procedure," and the response thereto filed by respondent, Wayne Scott, Director, Texas Department of Criminal Justice, Institutional Division, on December 7, 1994, the court has determined that the motion should be denied.

Hogue urges the court to enter amended findings of fact and conclusions of law and direct the entry of a new judgment that would eliminate from the memorandum opinion and order signed by the court November 16, 1994, reliance by the court on Hogue's abuse of the writ as a reason why certain of the grounds of Hogue's application for writ of habeas corpus should be denied. In support of his motion, Hogue points to a concession made by respondent in his response to a motion for rehearing in *Hicks v. Scott,* 35 F.3d 202 (5th Cir.1994), that the Texas abuse-of-the-writ rule is not adequate as a procedural bar to defeat federal habeas review. Memorandum in Support of Motion to Alter and Amend Judgment, at 2. As he apparently did in *Hicks,* respondent virtually confesses error to the ruling of this court in the instant action on the same subject. However, respondent's confession in this ac-

tion does not appear to be related to the facts of this action but, according to the response, is prompted by the concession he made in *Hicks.* Respondent's Response to Petitioner's Motion to Alter or Amend Judgment Pursuant to Fed.R.Civ.P. 59(e) and Brief in Support at 1–2.

After again reviewing pertinent parts of the record, the court is convinced that its analysis and holding on the abuse-of-the-writ issue are correct.

Hogue's motion and respondent's concession fail to take into account the unique circumstance in this case that, not only did Hogue have fair warning that he was running the risk of a ruling of abuse of the writ, but he was expressly ordered on the second of his four trips to this court that the next application for writ of habeas corpus he filed must be a complete one and that, if it was not, he would suffer a waiver.[1] The court, acting through Judge Belew, could not have more clearly informed Hogue of his obligation to file a complete application for writ of habeas corpus, whether he were to file it in the federal court or in state court, and of the consequences that would follow if he were to fail to do so:

IT IS ORDERED THAT:

1. Petitioner by and through his counsel, Mr. Edgar Mason and Mr. Melvin Bruder, file an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, or file a post-conviction application pursuant to Tex.Code Crim.Proc.Ann. art. 11.07 (Vernon Supp.1987) with notice to this Court and to the Office of the Texas Attorney General, on or before January 8, 1988.

2. Petitioner present each and every claim known to Petitioner or his counsel on pain of waiver. *Autry v. Estelle,* 719 F.2d 1251 (5th Cir.1983).

10/16/87 order in No. CA4–87–669–K, styled "Jerry Lee Hogue, Petitioner, v. James Lynaugh, Director, Texas Dept. of Corrections."

---

1. The court was not called upon to make a ruling on whether Hogue so abused the writ as viewed from the standpoint of his federal court conduct that his abuse in that respect would provide yet

another reason why his petition should be denied. There may well be basis for such a conclusion.

**1546**

at 1–2. Hogue elected not to make his next filing of an application for writ of habeas corpus in the federal court but went back to state court and made a filing pursuant to Texas procedure, which was one of the options this court gave Hogue. On his return to state court, Hogue filed his fifth application for writ of habeas corpus, his fourth in the state court, through attorneys Edgar Mason and Melvyn Bruder. That application, which urged nine grounds for relief, was denied by the state court in January 1989. Thereafter, Hogue filed his third action for post-affirmance relief in this court on April 13, 1989, an action which was dismissed without prejudice at the request of Hogue. Then, Hogue again returned to state court, where he filed in March 1991 his seventh application for writ of habeas corpus, his fifth in the state court. The March 1991 application is the one that led to the state court's determination that Hogue had waived and abandoned his grounds by his abuse of the writ of habeas corpus.

The records of the various actions Hogue has taken since his conviction and sentence were affirmed on direct appeal make quite clear that Hogue has pursued a course of manipulating, and abusing, the writ process to the end of gaining additional time, not without a great deal of success considering that the capital murder for which he was convicted and sentenced occurred sixteen years ago and his sentence was imposed almost fifteen years ago.

The court remains convinced that Hogue has seriously abused the writ of habeas corpus and that his abuse of the writ provides an independent basis why certain of the grounds of his most recently filed application should be denied. Therefore,

The court ORDERS that Hogue's motion to alter and amend judgment pursuant to Rule 59 be, and is hereby, denied.